## LIDO OIL CO. v. W. T. WAGGONER ESTATE.

## W. T. WAGGONER ESTATE v. LIDO OIL CO.

### No. 3418.

Court of Civil Appeals of Texas. Amarillo.

June 18, 1930.

Rehearing Denied Sept. 10, 1930.

Storey, Leak & Storey, of Vernon, Chas. L. Black, of Austin, and Bullington, Boone, Humphrey & King, of Wichita Falls, for Lido Oil Co.

James T. Montgomery, of Wichita Falls, Berry, Warlick & Gossett, of Vernon, and Hugh B. Smith and Thompson & Barwise, all of Fort Worth, for W. T. Waggoner Estate.

## HALL, C. J.

This is the second appeal of this case. As originally instituted, the style of the case was W. T. Waggoner Estate v. Sigler Oil Co. Since the last trial, by an amendment of its charter, the Sigler Oil Company became the Lido Oil Company. The opinions rendered by this court, by the Commission of Appeals and the Supreme Court upon the former appeal are reported in 276 S. W. 936, 284 S. W. 921, and 19 S.W.(2d) 27. Both parties have appealed from the judgment of the trial court, but, since the action was originally instituted by the Waggoner Estate, it will hereinafter be called the plaintiff, and the Lido Oil Company will be called defendant.

The purpose of the suit was to cancel the assignment of 3,000 acres out of an oil and gas lease executed and delivered on January 27, 1919, by A. B. Wharton and wife, Electra Wharton, and W. T. Waggoner to W. G. Burton, as lessee, covering 85,000 acres of land in Wilbarger and Baylor counties. By mesne conveyances, the 3,000 acres of the original leasehold included in this suit was assigned to the Sigler Oil Company on December 26, 1919. The original lease to Burton recites a consideration of $100,000 cash in hand paid, and contains the usual stipulations for assigning, subleasing mining, and operating for oil and gas, laying pipe lines, building tanks, etc.

The stipulations therein contained which are material to the issues submitted are as follows:

"Annual rental provided for herein, to-wit: $100,000.00 per year, payable annually in advance on the 27th day of each January during the life of said lease, to be placed in the First National Bank, Ft. Worth, Texas, provided each producing well shall hold 2,000 acres in a square, said well to be the center and said 2,000 acres shall be released as to further annual rental."

"It is agreed that this lease shall remain in force for a term of five years from this date and as long thereafter as oil or gas or either of them is produced from said land by the lessee.

"In consideration of the premises, the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"If no well be commenced on said land on or before the 1st day of June, 1919, this lease shall terminate as to both parties allowing reasonable time for unavoidable delays.

"Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

"If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns. * * * And it is hereby agreed that in the event this lease shall be assigned as to a part or as to parts of the above described lands and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rentals due from him or them, such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said land upon which the said lessee or any assignee thereof shall make due payment of said rental."

By its third amended original petition, the Waggoner estate, plaintiff, alleged the acquisition by the defendant, Lido Oil Company, of the interest claimed under the Sigler assignment of 3,000 acres, which is described in the pleading, and alleged that the original lease by its terms expired five years after the date thereof, except in the event of the drilling of any producing well or wells on said land, and with reference thereto the lease provided that there should be saved to the one who drilled such oil well or wells from the expiration of said lease, as much as, but not more than, 2,000 acres in a square around each producing well or wells with the said well as the center of said square.

It is further alleged that the Sigler Company had drilled certain wells referred to as Sigler Nos. 1 and 3, and that using well No. 1 as the center of the proposed square and respecting the outside boundaries of the entire 3,000-acre tract covered by the Sigler lease, there could be laid out in a square, with said well as the center, only 1,698 acres. It is further alleged: That under the terms of the original lease it was the duty of Burton and his assignees to use reasonable diligence in the further development of the property after the discovery of oil in Sigler well No. 1. That plaintiff had demanded a performance of this duty, but that the Sigler Oil Company had failed and refused to do so. That Sigler had drilled three wells on the property, two of which were producing, but that, by reason of the failure and refusal of defendant to further explore, test, and develop the said land, the defendant's title had terminated and had reverted to and reinvested in plaintiff. That, notwithstanding the termination of the title, defendant was still claiming the same, which cast a cloud upon plaintiff's title and plaintiff prayed for the removal of the cloud. It is further alleged that by the failure of the defendant to use reasonable diligence in developing the property it had abandoned all the property except 10 acres around each well, and that the plaintiff was entitled to a cancellation of the lease.

In the alternative, plaintiff alleges that, if it should be found that defendant has not already lost its title under the terms of the lease, then that plaintiff is entitled to a decree of specific performance of the obligations contained in the lease.

As a second alternative, the petition asserts that plaintiff is entitled to recover damages by reason of defendant's breach. The prayer is that plaintiff have a decree canceling the lease and removing cloud from title, and, in the alternative, that it have a judgment removing the cloud from all of the land except an area of 10 acres around each producing well, and that, as to all of the other land, it be decreed that defendant had abandoned its title, and further, in the alternative, that it have a decree for specific performance of the obligations of the lease, and, in the further alternative, that it have damages for the sum of $800,000.

The case was tried upon the defendant's second amended original answer filed November 25, 1929, in which defendant alleges that the lease is in full force and effect, not only as to the 1,698-acre tract, but also as to the entire 3,000-acre tract assigned to defendant, which includes the 1,698-acre tract. Defendant sought to recover damages for oil produced by the plaintiff and its lessees on a portion of the acreage contained within the 3,000-acre tract originally assigned to Sigler, but outside of the 1,698 acres, of which the two wells were the center. The defendant alleges that its predecessor, Sigler Oil Company, during the primary term of the lease, that is, during the five years, drilled the two producing wells and paid all rentals during that term on the excess acreage, that is, on that part of the 3,000 acres lying outside of the 2,000-acre squares surrounding said wells, and that in virtue of these facts the lease was in full force and effect at the end of the primary term of five years and two days thereafter when plaintiff filed this suit as to the entire 3,000 acres.

Defendant set out in detail the work of development done by it and the expenses incurred before the suit was filed and further presented a plea of res judicata in answer to the plaintiff's effort to obtain a cancellation of the lease, setting out in detail the proceedings in the various courts incident to the first trial and appeal.

By its first supplemental petition filed November 25, 1929, in addition to demurrers and general denial, plaintiff alleged: That the lease had terminated as to all of the 302 acres of the original 3,000-acre lease lying north of and outside of the boundary line of the squares, including the two wells as centers. That the lease as to all of such land

expired by its own terms five years after its date. That no rentals were ever paid after January 27, 1923. That, if plaintiff be mistaken in such construction of the lease, then it is alleged that the instrument is ambiguous. That the parties had given to it the construction contended for, and that such was the intent, purpose, and agreement of all parties. Plaintiff further alleges abandonment by defendant and estoppel by reason of certain conduct to be hereinafter discussed.

The record shows that the original suit was filed two days after the expiration of the primary term, that the two producing wells are near 283 feet apart, and that a tract of 2,000 acres around one well as a center is almost coincident with the tract of 2,000 acres drawn around the other well as a center. We state further, in explanation of the pleadings, that the facts show that both wells were drilled so near the north line of the original 3,000-acre tract that both of the squares extended beyond the north boundary of the 3,000-acre tract, leaving only 1,698 acres of the two 2,000-acre squares within the boundaries of the original 3,000-acre tract.

With reference to the plaintiff's plea of estoppel and acquiescence, it appears that, after the suit was filed, other parties acquired from plaintiff certain portions of the 3,000 acres not embraced within the two overlapping 2,000-acre tracts, and it is insisted that the defendant acquiesced in the acquisition by the third parties of said excess acreage, and is estopped thereby from asserting any claim beyond the boundaries of the 1,698 acres.

Upon the conclusion of the evidence, the trial court peremptorily instructed the jury to find for the defendant, Lido Oil Company, in so far as its lease covered 1,698 acres of land lying south of the north boundary line of the 3,000-acre tract. He further directed the jury to find, in addition thereto, in favor of the defendant for another tract described by metes and bounds aggregating 302 acres lying south of the 1,698-acre tract and adjacent thereto and within the boundaries of the 3,000-acre tract. The court further instructed the jury to find in favor of the plaintiff and against the defendant as to all of the remainder of the 3,000-acre tract of land, and to find against the plaintiff upon its action for damages and specific performance.

From a judgment rendered in accordance with the verdict, both parties have appealed.

In directing a verdict, the trial court seems to have proceeded upon the theory that the provision of the lease, to the effect that the 2,000 acres should be laid out in a form of a square with the producing well as a center, was for the benefit of the lessee, and that the lessee, having brought in two producing wells during the primary term, was entitled to 2,000 acres, and, it not being possible to form a square around well No. 1 aggregating

2,000 acres all lying within the boundaries of the 3,000 acres, the court extended the line to the south, awarding to the defendant a tract lying adjacent to the 1,698 acres, amounting to 302 acres, thereby decreeing a recovery to defendant of 2,000 acres all within the limits of the original 3,000 acre tract.

From the foregoing statement it is apparent that the Lido Oil Company seeks to recover an additional 1,000 acres, that being all that part of the 3,000 acres lying outside of the tract of land awarded to the defendant by the Trial Court.

In the following sketch, the heavy lines represent the 3,000-acre tract described in the assignment to Sigler. The light lines represent the two 2,000 acres around Sigler producing wells No. 1 and 3. The judgment of

the court awarded that part of the two 2,000-acre areas lying south of the north line of the 3,000-acre tract, and consisting of 1,698 acres, to the defendant. In order to compensate it for the loss of the 302 acres lying north of the north line of the 3,000-acre tract, the court added 302 acres in an irregular shape, lying south of and adjacent to the 1,698-acre tract, aggregating 2,000 acres, all within the original 3,000-acre tract which Sigler acquired from Burton. The area east of the dotted line and within the original 3,000-acre tract represents the lands leased by plaintiff to Davis, Cosden, et al., since this suit was filed. All that portion of the 3,000 acres lying outside of the 1,698-acre area is referred to in the briefs of both parties as "outside acreage," and will be so designated in this opinion.

By the amendment of their pleadings since the first trial, the issues upon this appeal are changed to some extent, and, in an effort to plead and try the case in the light of the opinion by the Supreme Court [19 S.W.(2d) 27, 29], both parties have changed their position with reference to certain contentions made upon the former appeal.

■ It is clear from a careful inspection of the plaintiff's first amended petition and the defendant's answer thereto that the entire tract of 3,000 acres was involved in the first trial; the rule being that the court may look to the pleadings of both parties to ascertain what was really involved.

In so far as this court reversed the judgment and remanded the case for a new trial, the Supreme Court has affirmed our disposition made of the appeal, and has also remanded the case to the district court for a new trial "in accordance with the opinion" of the Supreme Court. It appears from the briefs that counsel for the respective parties disagree with reference to the effect of the holding by the Supreme Court in several particulars. The plaintiff, Waggoner Estate, insists that, under the statute and the rules promulgated by the Supreme Court with reference to the disposition of questions not urged by specific assignment of error in the application for a writ of error from this court to the Supreme Court, what was said by the Supreme Court is dictum, and has no reference to any of the land outside the 2,000 acres, because the judgment of the trial court had deprived defendant of all outside acreage, and defendant had assigned no error upon that portion of the decree.

It is said that the rules of court are but a means to accomplish the ends of justice, and a court which has the power to make rules also has the power to disregard, modify, or suspend such rules whenever justice requires it, when in doing so no positive rule of law has been violated. 15 C. J. 912, 913; Clement v. First National Bank, 115 Tex. 342, 282 S. W. 558; Connor v. City of Paris, 87 Tex. 32, 27 S. W. 88.

■■ To what extent the Supreme Court may go in deciding the rights of the parties, regardless of its rules, even if the rules have been disregarded, is a matter which this court has no power to decide. What the Supreme Court has said is binding upon this court. Under the Constitution and laws of this state, the Supreme Court has the power to make rules governing its own procedure, as well as the procedure of the lower courts, and if, as is contended, it has disregarded one of its rules, that is a matter for the determination of that court alone. Our sufficient answer to the contention that the Supreme Court cannot adjudicate the respective rights of the parties to the 1,000 acres is, it has done it.

It is clear from the record before us that this case has not been tried in accordance with the opinion of the Supreme Court, and it becomes our duty to reverse the judgment and remand it for another trial because there were issues of fact which should have been submitted to the jury.

As we interpret the opinion of the Supreme Court, the lease in question is an "unless" lease, and the estate acquired by the defendant and its predecessor is a determinable fee which could be lost only upon cessation of the use of the land for the purposes of oil and gas exploration, development, and production. It is conceded that oil has been produced from two wells in paying quantities ever since they were completed. It was further expressly held that, after the discovery of oil in paying quantities, the defendant was under an implied obligation to continue development and exploration upon the whole 3,000-acre tract with reasonable diligence. And it is further held that a breach of the implied obligation to use further reasonable diligence does not authorize the forfeiture of the lease as for a breach of condition subsequent, for the reason that said obligation is merely a covenant. Judge Greenwood says that the stipulation in the lease that each producing well should hold 2,000 acres in a square relates only to the obligation requiring the payment of future rentals, and, notwithstanding this stipulation, "the assignee of the original lessee, was under an implied obligation, after the drilling of the two paying wells, to continue with reasonable diligence, during the five-year term as well as thereafter, the work of exploration for, and production of, the oil and gas in the 3,000 acres."

Whether under the rules of the Supreme Court a consideration of the effect of this obligation should have been confined only to the 2,000 acres, the fact remains that its effect with reference to the whole 3,000 acres was considered by the court and we are not willing to pass it as mere dictum.

That the Supreme Court considered the rights of the parties with reference to the 3,000 acres rather than to the 1,698 acres or the 2,000 acres is clear, from the further reason that Judge Greenwood said: "We would do violence to what all parties plainly intended should we interpret this lease in such manner as to absolve the lessee or his assigns from the duty of reasonable development after proving that the 3,000 acres contained oil in paying quantities."

■ Several witnesses, who may be properly classed as experts, testified with reference to the extent of development of the 3,000 acres during the five-year term and to numerous facts bearing upon the issue of reasonable development, such as the absence of a pipe line, the expense of transporting the oil obtained from the wells by truck to the nearest market or railroad station, the drilling by the defendant and under its direction of two dry wells within the 2,000-acre tract, and the drilling of several dry wells and producers by the Triangle and Atlantic people and others, both before and after the filing of the suit, on other lands in the vicinity. The

cost of drilling the first four wells by the Sigler Company, two of them being dry, the amount received from the two producers, the cost of a storage tank, supplies, etc., in equipping and operating the wells, was all shown as bearing upon the issue of reasonable development. It is clear that the testimony of these witnesses and the facts and surrounding circumstances which would enter into the advisability of further development and its extent raised an issue of fact which should have been submitted to the jury.

■ Considering the 3,000 acres in its entirety, we think, in the light of what the Supreme Court has said, that the trial court did not err in refusing to submit the issue of abandonment. As we understand the Supreme Court's opinion, Judge Greenwood holds that the only clauses in the lease which delimit the estate granted are: First, the clause which provides for the termination of the lease unless a well was commenced on or before June 1, 1919. The record shows that this term was complied with. The second clause is that which leases the land for the sole and only purpose of mining and operating for and producing oil for market. The uncontradicted testimony shows that, ever since the first well was drilled to production, oil has been continually marketed from that well and also well No. 3, which was drilled to production a few months after well No. 1 was completed, and it is not contended that the property was used for any other purpose than as a mineral lease. The record further shows compliance with the third clause, which provides that the lease should remain in force for a term of five years from its date upon payment of annual rentals, and as much longer as oil or gas was produced from the land by the lessee. Rent was paid and received for the full term of five years on the 1,000 acres in excess, and royalties were paid and received from the two wells on the 2,000 acres to the date of the trial. There having been no cessation in the use of the leased premises considered as a whole, for the purposes for which the land was assigned, and no specific intent to abandon prior to the filing of the suit having been shown, the issue of abandonment is not in the case.

It is further insisted that the Sigler Oil Company is estopped from claiming any interest in the "outside acreage," and especially in the several tracts which the Waggoner Estate leased to Davis Oil Company, Cosden Oil Company, Grayback Oil Company, et al. It was shown that the plaintiff's agent, Bob More, made these leases with the knowledge of the officers of the Sigler Company. Several witnesses testified that Ray Belcher and other officers of the defendant's predecessor had disclaimed all interest in the excess acreage; that Bob More contended all the time the excess acreage had been forfeited by reason of nondevelopment.

■ The circumstances surrounding the transactions through which Cosden et al. acquired several small tracts in the "outside acreage" may be sufficient to raise the issue of estoppel against the defendant and in favor of these claimants. Davis, Cosden, et al., have not intervened in this suit, and, while they may be proper parties, they are not necessary parties to the action, because they acquired their several interests pendente lite.

After a careful review of the testimony and facts which it is contended show that defendant is estopped from claiming the "outside acreage" at this time, we are convinced that such contention must be overruled.

■ The effect of the trial court's decision in the first trial was to deprive the Sigler Company of any right to any part of the excess acreage, or at least this court so construed the judgment. The practical construction placed upon the contract by Sigler and its conduct thereafter was induced by the erroneous construction of the contract made by the trial court and approved by this court. The general rule is that, where a contract is ambiguous, the court may look to the construction which the parties have placed upon it in order to ascertain its true meaning. Galveston H. & S. A. Ry. v. Johnson, 74 Tex. 256, 11 S. W. 1113; Young v. Jones (Tex. Civ. App.) 222 S. W. 691. But this rule cannot be applied, for the reason that prior to the first trial and the opinion rendered by this court, the contract, in our opinion, was not ambiguous. Such acts and conduct having been induced by the judgment of the lower court and of this court, it was such a mistake of law that no defense of estoppel can be predicated thereon. Contracts made in mutual error under circumstances material to their character and consequences seem upon general principles to be invalid. Harrell v. De Normandie, 26 Tex. 120; Altgelt v. Gerbic (Tex. Civ. App.) 149 S. W. 233. Even where a mistake is not mutual, 2 Pom. Eq. Jur. (4th Ed.) 849, says this principle should govern: "Whenever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relation, either of property or contract, or personal status and enters into some transaction the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact."

This principle is further discussed in 13 C. J. 397, § 268, and in the Texas cases cited in Ferguson v. Mounts (Tex. Civ. App.) 281 S. W. 616. Under the rules laid down in the authorities mentioned, it is our opinion that the defendant is not estopped by either its conduct or the acts and representations of its predecessor, the Sigler Oil Company, and its officers.

As stated in the former part of this opinion, the plaintiff prayed for damages caused by the defendant's failure to develop with reasonable diligence. This claim is not based upon the fact that, by reason of the failure of defendant to develop, the land has been drained by surrounding wells, but the sole contention is that, by reasonable development, producing wells could have been brought in, and plaintiff would have realized handsome profits in the way of royalties.

Considerable evidence was introduced showing the extent of development after producing well No. 1 was brought in. The map shows that three dry wells were thereafter drilled and two or possibly three producing wells within the 1,698 acres. Some of these were drilled after this suit was filed, but in our opinion this number of wells upon an area covering the 1,698 acres, and the results obtained from the drilling of said wells, is not sufficient to enable a jury to arrive at any fair or reasonable estimate of the amount of the damages, if any, the plaintiff has suffered. Experts who testified said that it was only by the drilling of wells that the existence or nonexistence of oil or gas could be ascertained and the testimony is entirely too uncertain to form a basis for a verdict awarding damages.

Several expert oil operators and Bob More, who seems to have superintended the matter of drilling wells for the plaintiff over a vast territory for about twenty years, all testified, giving their ideas as to what would constitute reasonable development of the 3,000 acres under all the circumstances surrounding the lease in question. We think this testimony was sufficient to have required the trial court to inquire of the jury whether there had been reasonable development since the bringing in of the discovery well, and, if this issue was answered in the negative, then to have submitted the further issue as to what would constitute reasonable development under all the facts and circumstances. As we construe the opinion of the Supreme Court, in the light of the record before us, these issues should have been submitted.

The contention is made that the bringing in of one well on the original lease of 85,000 acres and the payment of the annual rentals thereafter was sufficient to vest a determinable fee in Burton. That question is immaterial, and we are concerned in this case only with the rights of the parties relative to the 3,000 acres assigned to Sigler and now owned by the defendant.

According to the opinion of the Supreme Court, if the proof introduced tended to show damage was so uncertain and unsatisfactory that no just verdict could be predicated upon it, and the verdict was further to the effect that the land had not been reasonably developed, and a further finding was returned determining what constituted reasonable development, the trial court could have entered judgment requiring the defendant to develop in the manner and to the extent set out in the verdict and decreeing a forfeiture upon the failure to do so.

There are numerous other contentions made by the several parties, which we think are immaterial in view of what has been said, and they are all overruled.

For the reasons stated, the judgment is reversed, and the cause remanded.