ANASTACIO GARCIA ET AL V. R. A. KING ET AL.

No. 7905. Decided July 15, 1942.
Rehearing overruled October 7, 1942.
(164 S. W., 2d Series, 509.)

*Gordon Gibson* and *Phelps & Phelps,* all of Laredo, for plaintiffs in error.

It was error for the Court of Civil Appeals to hold that the production of three-fourths of a barrel of oil daily from a 7,500 acre tract of land, resulting in a royalty of less than $30.00 annually was a substantial production of oil and was sufficient to keep alive a lease providing that it should remain in existence so long as oil was produced from the land. Cole Pet. Co. v. U. S. Gas and Oil Co., 41 S. W. (2d) 417; Ryan v. Kent, 36 S. W. (2d) 1007; Zeppa v. Houston Oil Co., 113 S. W. (2d) 612.

*Mann & Mann* and *Tom. C. Mann* and *Herbert G. Davis,* all of Laredo, for defendants in error.

The undisputed evidence shows that the cessation of production in paying quantities was temporary, and not permanent, and such cessation, as a matter of law, was not of such nature as to operate to terminate the lease. Persky v. First State Bank of Vernon, 117 S. W. (2d) 861; Watson v. Rochmill, 134 S. W. (2d) 710; W. T. Waggoner Estate v. Sigler Oil Co. 118 Texas 509, 19 S. W. (2d) 27.

*W. O. Crain, Wm. E. Loose, R. H. Whilden,* all of Houston, *Joiner Cartwright* and *Jack C. Hardy,* both of Beaumont, *T. L. Foster, J. W. Timmins* and *Martin A. Row,* all of Dallas, filed briefs as amici curiae.

MR. JUSTICE ALEXANDER delivered the opinion of the Court.

This suit involves the construction of an oil and gas mining lease. The lease was to run for a period of ten years "and so long thereafter as oil, gas, or other minerals is produced from said land." The material question to be determined is whether sufficient oil was produced from the land after the expiration of the primary period to keep the lease in force.

The lease in question covered 7,500 acres of land. From 1925 to 1929 the land was under a lease that required the payment of an annual rental of $13,284.00, regardless of the amount of oil produced. Lessees were unable to pay this annual rental. Litigation ensued and a settlement was reached by the terms of which lessees paid lessors $3,500.00 in cash and agreed to pay them $2,500.00 out of the 1/8 of production, and the 10-year paid-up lease with a 1/8 royalty now in question was executed. It provided in part as follows:

"Subject to the other provisions herein contained this lease shall be for a term of 10 years from this day (called primary term) and as long thereafter as oil, gas, and other minerals is produced from said land hereunder."

At the time the lease was executed there were 112 producing wells on the land. The wells yielded large quantities of oil, from which the lessors were paid royalties running into thousands of dollars annually. All production was from a shallow reservoir, less than 200 feet deep. In the spring of 1936 forty-seven wells were still producing. At that time production ceased temporarily because a gas well that was furnishing fuel for pumping played out. Thereupon the lessees abandoned the shallow wells and decided to explore for oil in deeper sands. The money for this exploration was raised by sale of the casings and other equipment in the shallow wells. The deep tests were unsuccessful, and the lessees began drilling shallow wells again. At the expiration of the primary term on February 6, 1939, six shallow wells were being operated. Before that time, on November 15, 1938, the lessees had entered into a contract with one Juarez whereby Juarez was to operate the lease and receive as his compensation the entire seven-eighths working interest belonging to the lessees. This contract continued until July 16, 1939. During this period a total of 195 barrels of oil was produced, averaging about 24 barrels per month. After deducting the lessors' royalty of $19.11, a total of $135.70 was received by Juarez for his seven-eighths of the oil, or $16.96 per month, which was barely adequate to pay for his labor in operating the wells. Out of this compensation, Juarez had to pay about a dollar each month for fuel. During this period of eight months the lessees received nothing at all from the lease, and yet they were paying the annual taxes thereon. In addition they had to make numerous trips at their own expense to the leased premises. The lessors received only about eight cents per day as royalty from the lease. From these undisputed facts it is clear that production was not in paying quantities when the primary term expired. However, there is evidence tending to show that production was increased after the termination of the Juarez contract, and that before the time of the trial production was obtained in paying quantities.

The lessors filed this suit against the lessees to cancel the lease and remove it as a cloud from their title to the land. Trial was to a jury, but upon the jury's failure to agree upon several of the special issues, the trial judge discharged the

jury and rendered judgment for plaintiffs on the ground that their motion for peremptory instruction should have been granted. The court found that the undisputed evidence showed that the lease expired by its own terms at the end of the primary term because neither oil nor gas was then being "produced," within the meaning of the lease. Upon appeal the Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for the defendants, holding that the term "produced" did not mean "produced in paying quantities." 152 S. W. (2d) 918.

It will be noted that the lease provides, in effect, that it shall run for a period of ten years, and as long thereafter as oil is "produced" from the land. It does not provide, as is ordinarily the case, that the production must be "in paying quantities" in order to continue the lease in force after the expiration of the primary term. At the end of the primary period the lease was producing only about 24 barrels of oil per month. This quantity was susceptible of division, but was insufficient to yield a profit over and above operating and marketing expenses. It becomes necessary for us to determine what is meant by the term "produced," as used in the lease. It is the plaintiffs' contention that the term "produced" means the same thing as "produced in paying quantities," while the defendants contend that the terms of the contract are met if enough oil is produced to be susceptible of division. So far as we have been able to determine, the question has not heretofore been passed on in this State.

The question was before the Supreme Court of Illinois in the case of Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N. E. 1043. In that case less than a hundred barrels of oil had been recovered over an eighteen-months period. The Supreme Court of Illinois said:

"The lease was for a five-year term, and so long thereafter as oil or gas was produced. Oil was produced continuously after the drilling of the well. It is true that the quantity produced was so small as to make the venture unprofitable, but the strict letter of the lease was complied with, and it had not expired by its own terms."

No authorities were cited in support of this ruling. It will be noted that the above case was decided in 1913, before the oil industry had been fully developed.

In the case of Enfield v. Woods, 198 Ky. 328, 248 S. W. 842, the Supreme Court of Kentucky used language which on its face appears to be decisive of the question. It was there said:

"It will be observed that the lessee is not required to produce oil in paying quantities, but he is required to produce oil or gas one or the other, from the premises. This, of course, means a production of oil or gas in such quantities as to be susceptible of division, so as to pay the landowner a royalty, even though small. A mere showing of oil manifestly is not sufficient, even though produced. The production must be tangible and substantial, but it need not be great."

An examination of the case, however, discloses that the well there under consideration produced only a mere scum of oil, and the court held that this was insufficient to keep the contract in force. In view of the facts there involved the statement concerning production in paying quantities was not necessary to the decision of the case.

The above authorities are the only ones that we have found in which the question has been decided favorably to the defendants. After careful consideration we are of the opinion that the weight of authority supports plaintiffs' contentions.

In Gypsy Oil Co. v. Marsh, 121 Okla. 135, 248 p. 329, 48 A. L. R. 876, the Supreme Court of Oklahoma passed directly on the question now before us. In that case the lessee had discovered oil in a shallow sand, but not in paying quantities, and was attempting to hold the lease beyond the primary term by producing from that sand in order to drill to a deeper sand at a later date. In discussing the question the court said:

"Some authority may be found holding that, if a lease is to continue so long as oil or gas is produced, it is immaterial whether the lease is a paying one or not, for so long as the well drilled produced either oil or gas the lease continues. Thornton, Oil & Gas, Sec. 150, citing Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N. E. 1043. The construction there given the term 'produce' does not appeal to us, because the very purpose of the landowner in executing the lease is to have the oil and gas on the leased premises produced and marketed so that he may receive his royalty therefrom, and the purpose of the lessee is to discover and produce oil and gas in such quantities

as will yield him a profit. These are material elements to be considered in the interpretation of the contract, and, if consideration is given these elements, it must be held that the word 'produce,' when used in this connection, means something more than mere discovery of a trace of oil or gas, or the discovery thereof in quantities so small as to render operation of the well unprofitable. Such a well would be of no benefit to either party."

"In Parks v. Sinai Oil Co., 83 Okla. 295, 201 Pac. 517, this court had occasion to consider a lease containing, in effect, the same provision as is contained in the lease here under consideration, and it was there held that, when the lease provided that it should remain in force for a term of one year from date, and so long thereafter as oil or gas is produced, it was a condition precedent to the extension of the lessee's right to continue operations beyond the one year that oil or gas should be found in paying quantities within one year from the date of the lease. Thus it will be seen that this court is committed to the doctrine that, when used in this connection, the terms 'produced' and 'produced in paying quantities' mean substantially the same thing. We have no desire to depart from the holding in that case, but believe that the construction there placed upon the contract is in harmony with the plain intent of the parties, and to hold otherwise would give to the term 'produced' a meaning not within the contemplation of either party."

In defining the term "paying quantities" the court said:

"It has been generally held that 'paying quantities,' when used in this connection, means paying quantities to the lessee. If a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable. Ordinarily, the phrase is to be construed with reference to the operator, and by his judgment when exercised in good faith."

The court concluded that the lessee's claim that oil was produced in paying quantities was not made in good faith, and affirmed the judgment of the trial court cancelling the lease. This decision was followed by the Oklahoma court in Woodruff v. Brady, 181 Okla. 105, 72 Pac. (2d) 709, 113 A. L. R. 391.

In Berthelote v. Loy Oil Co., 95 Mont. 434, 28 p. (2d) 187, the Supreme Court of Montana had under consideration a lease

that was to run for a period of five years "and so long thereafter as oil and gas or either of them is produced from said land by the lessee." Said court approved the trial court's instruction to the jury that in order for such a lease to be continued in force under the "thereafter" clause, oil or gas must be produced in "paying quantities," which was defined to be such an amount of production as would pay a small profit over the cost of operation of the well, excluding from consideration the initial cost of bringing the well into production. The court said:

"Some courts have held that under a similar 'thereafter' clause, any production which is capable of being divided is a sufficient compliance to continue the life of the lease, as in Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N. E. 1043, and McGraw Oil & Gas Co. v. Kennedy, 65 W. Va. 595, 64 S. E. 1027, 28 L. R. A. (N. S.) 959. Suffice it to say that we are not impressed with the reasoning in the case so holding, and decline to follow them.

"Frequently oil and gas leases in the 'thereafter' clause provide that the lease is to continue after the fixed term so long as oil or gas is produced in 'paying quantities.' Most courts hold the legal effect of that clause and of the one 'so long as oil and gas is produced' to be the same; and to extend the lease under a clause such as is before us, the production must be in paying quantities. Summers on Oil and Gas, Sec. 98, pp. 315, 316; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. (N. S.) 848; Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 48 A. L. R. 876; Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517. We prefer to follow the majority rule."

In Benedum-Trees Oil Co. v. Davis, 107 Fed. (2d) 981, a case arising in Tennessee, the lessee completed a well producing gas but no oil, and capped it for want of a market. Interpreting the lease, the Sixth Circuit Court of Appeals said:

"The leases here in question were for five and one years respectively and 'as long thereafter as oil or gas or either of them is produced from the land by the lessee.' There is absent from them the exact language that gas or oil must be produced in 'paying quantities.' However, in arriving at the intent of the parties, this is implied because they contracted with the end in view that the business would be profitable to both lessor and

lessee. The latter may have realized a gain by retaining the leases for speculation. The former could receive no benefits from them except by marketing gas from the premises. *. * *

"The term 'paying quantities' involves not only the amount of production, but also the ability to market the product at a profit."

In Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314, the lease was to continue after discovery of a well "so long as oil or gas was produced from such well." The lessee completed a well producing five barrels per week, which could not have yielded a profit to the lessee if independently operated, but did yield a small profit because the lessee was able to pump it by machinery on an adjoining lease. The court held that this was not production within the meaning of the lease. In this connection it was said:

"It was never contemplated that the lease under consideration should be continued for all time to come upon the mere production of oil in quantities not sufficient to compensate the lessee and totally inadequate as a consideration to the lessor for continuing the lease."

It should be noted that we are dealing with a situation in which, under normal conditions, all of the producing wells on the lease in question at the time of the termination of the primary period were not producing enough oil or gas to pay a profit over and above the cost of operating the wells. In order to understand and properly interpret the language used by the parties we must consider the objects and purposes intended to be accomplished by them in entering into the contract. The object of the contract was to secure development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary period of the contract. So far as the lessees were concerned, the object in providing for a continuation of the lease for an indefinite time after the expiration of the primary period, was to allow the lessees to reap the full fruits of the investments made by them in developing the property. Obviously, if the lease could no longer be operated at a profit, there were no fruits for them to reap. The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees. Since the lease was no longer yielding a profit to the lessees at

the termination of the primary period, the object sought to be accomplished by the continuation thereof had ceased, and the lease had terminated.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

Opinion delivered July 15, 1942.

Rehearing overruled October 7, 1942.