Lillie M. CLIFTON, Individually and as Executrix of the Estate of J. H. Clifton, Deceased, et al., Appellants,

v.

R. W. KOONTZ et al., Appellees.

No. 15831.

Court of Civil Appeals of Texas.

Fort Worth.

July 5, 1957.

Rehearing Denied Sept. 20, 1957.

Rogers, Eggers & Sherrill, and Guy Rogers, Wichita Falls, for appellant.

Gilbert P. Howard, Dallas, Woodruff & Woodruff and W. B. Woodruff, Jr., Decatur, for appellee R. W. Koontz.

Nelson, Montgomery, Robertson & Sellers, and Robert K. Pace, Wichita Falls, for appellee, Magnolia Petroleum Co.

MASSEY, Chief Justice.

In 1940 Lillie M. Clifton, joined by her husband, executed an oil, gas and mineral lease upon certain property. In due course and before expiration of the primary period specified in the lease, the lessees drilled a producing well thereon. This well produced both gas and oil, though not too much of the latter, and was classified under rules and regulations of the Texas Railroad Commission as an "associated" (with oil) gas well.

As is quite common, the leasehold estate became broken up over a period of years into various fractional interests, with "over-rides", etc., and belonged to many persons and concerns. Lillie Clifton's husband died and she became the executrix of his will and estate.

The well on the lease in question was never very profitable after the first two or three years, though it continued to produce the maximum amount of gas permitted under the rules and regulations of the Railroad Commission. While such does not tell the whole story, the general theory of allowable production under such rules and regulations is based upon an "estimated" size of a gas reservoir underlying a lease of 320 acres or well on such a lease in a "field", and that theoretical factor taken into consideration along with the "bottom-hole" pressure in the well enables the Commission to set the gas production allowed to be taken therefrom in a calendar month, whether or not such amount is the maximum that could be produced. If the pressure is low the production allowed will be low, and that was the case as to the well on the lease in question. The size of the lease is approximately equal to the basic size used by the Railroad Commission in computing the size of a reservoir. The circumstance operated to reduce production to such a point that operation thereof in any particular month was as likely, or perhaps more likely, to show a loss rather than a profit.

R. W. Koontz, formerly an employee of the lessees and as such familiar with the circumstances of the well in question, decided that it would be good business to acquire all the leasehold estate that he could, promote the remaining owners, try to get the Commission's classification of the well changed to that of a "non-associated" gas well, and to rework the well by the rather new "sand-fracting" method. He was of the opinion that by such a re-classification he would be allowed to produce a much greater amount of gas from the well under the formula of the Commission fixing production "allowables", and further of the opinion that through the reworking procedure there would likely be more gas to be produced. He obtained the reclassification and the reworking was performed the latter part of September, 1956, or first part of October, 1956, with extremely successful results.

In August of 1956, Koontz and most of the other owners of the leasehold estate were served with citation in a suit prosecuted by Mrs. Clifton, individually and as executrix of her husband's estate. A few months earlier a Mr. Kadane had drilled a well on an adjoining lease and had obtained a good oil well. He entered into a contract with Mrs. Clifton, the effect of which committed him to lease all or part of the leasehold *acreage* that she could get canceled on the tract in question, and to drill a well in a search for oil and/or gas thereon. Mrs. Clifton, individually and as independent executrix, was plaintiff in the court below and is appellant here, and for convenience will hereinafter be termed appellant. Mr. Kadane joined her in the trial court, and likewise on the appeal, but no useful purpose is served by referring to him as a party.

It is of interest to note that the stratum from which Kadane obtained an oil well and from which the existing well on the lease is producing gas is one and the same. It is called the Conglomerate formation, and is located at depth interval between 5,300

and 5,600 feet. Sometimes a well drilled into it will produce oil and sometimes it will produce gas. Any well drilled into it may reasonably be expected to produce one or the other or both. As previously noted, however, when a well is drilled into a formation which is either an "associated" or "non-associated" gas well, the Railroad Commission considers that a gas reservoir underlies the well and 320 acres of the lease on which the well is located, from which reservoir allowable production is limited. The limit on gas production is "as to reservoir" rather than "as to well", and if a second well is drilled into the formation and it is a gas well, then there would be no appreciable difference in the total amount of gas which could be withdrawn from the reservoir and an operator could not produce any more even though he had put down a second well. At the same time it appears that should the drilling of the second well prove "dry", thus disproving that the size of the gas reservoir was as large as estimated, there would be a reduction in the amount the operator would be permitted to produce. It is to be remembered that the factors are the estimated size of the reservoir and the "bottom-hole" pressure (or pressure within the reservoir).

Appellant's suit sought cancellation of the lease in its entirety on the theory that production therefrom in paying quantities had ceased. In the alternative, she sought cancellation of the lease (other than for 40 acres around the existing well) on the theory that the owners of the lease had breached the implied covenants to reasonably develop the existing minerals and/or to reasonably explore for new sources of production. Additionally, suit was for damages accrued because of breaches of express or implied covenants of the lease. Joined with counts in such respects were allegations in trespass to try title to real estate and/or to quiet title. Though citation was served upon them, owners of approximately 35% of the leasehold estate defaulted and made no appearance in the case. The trial court granted appellant default judgment in forfeiture of title as to said non-appearing defendants, who need not be mentioned by name.

As to the defendants who appeared, Mr. Koontz and others, who will hereinafter be termed appellees, the trial court rendered judgment in part in their favor and in part against them. The judgment decreed that any amount of damages due appellant was incapable of being established and was not established, wherefore prayer that they be granted was denied. The judgment recited that production of oil and/or gas from the lease in paying quantities had not ceased, wherefore the lease would not be canceled on that premise.

Then the judgment recited that appellees had breached the implied covenants to reasonably develop and reasonably explore the lease for oil and/or gas, and conditionally granted forfeiture of the leasehold estate *except for the stratigraphic interval between 5,300 to 5,600 feet.* The condition was that if appellees should, within sixty days from the date judgment in the case became final, select a site for drilling and drill to a depth of 5,600 feet, unless production in paying quantities was encountered at a lesser depth, the lease would continue in effect, but otherwise would expire except as to the above interval. In other words, the appellees were ordered to drill the well, with penalty of lease forfeiture except for the Conglomerate formation if they did not do so.

Appeal was perfected, and appellees are likewise in the position of appealing under two cross-assignments of error. Appellant still seeks the relief denied by the trial court, including complaint because of the peculiar limitation of the decree of conditional forfeiture. Appellees seek to be relieved of the burden imposed in the decree of conditional forfeiture.

We are of the opinion that the trial court correctly denied appellant the relief sought

here on appeal. We are of the further opinion that the trial court should have denied appellant the relief which was granted, and that it erred in granting the partial conditional forfeiture.

In preparing this opinion it was decided that simplification demanded initial consideration of a cross-assignment of error presented by appellees, as follows:

"Since the undisputed evidence showed that appellees have fully performed all express and implied covenants under the lease, and expended exceptionally large sums of money to make such lease profitable for both lessors and lessees and to fully explore and develop the same in accordance with the regulations of the Texas Railroad Commission, and that under such regulations additional drilling would probably result in little or no profit to lessors but in substantial loss to lessees, it was error for the court to require additional drilling, under penalty of even a partial cancellation of the lease."

The language of the cross-assignment is rather broad and encompassing but no complaint because thereof is made by appellant, and we are of the opinion that it should be sustained.

From the standpoint of the case as related to the implied covenants, we believe the judgment in the case must be considered as one of exploration rather than of development. There is no evidence in the record of any geological formation or horizon in the area where the lease in question is located other than the Conglomerate. It is from this formation that the existing well is producing gas and a little oil. It is from this formation that Kadane obtained a producer of oil on an adjoining lease. There is no evidence in the record that a reasonably prudent operator would drill in the area in a search for oil and/or gas other than into the Conglomerate. Indeed, the brief of appellant impliedly admits as much, and states that the provisions of the judgment are such that even with forfeiture effected there would be no additional drilling, for by its provisions the appellees' lease as to the Conglomerate would be preserved. If pursuant to drilling performed by any third person oil and/or gas should be encountered in the interval between 5,300 and 5,600 feet the operator could not produce it, that right being in appellees. Of course, appellant contended that appellees owed the duty to reasonably develop, but the trial court must have denied relief in this respect for even with forfeiture decreed appellees would still have the exclusive right to produce from the Conglomerate formation.

Considering the judgment as one for exploration then we note the proof in the record purportedly supporting the decree. While Kadane had agreed to enter into a contract with appellant to drill a well in a search for oil and/or gas if she could obtain a cancellation of the lease in whole or in part his agreement was premised upon a release of *acreage*, and not upon a release of *horizons under acreage*. So Kadane would not be bound to contract with appellant if forfeiture as decreed by the judgment should become final. Additionally, there was no evidence in the record that any reasonably prudent operator would drill in an exploratory search for oil and/or gas with the Conglomerate excluded as a formation from which he could receive production. Even if the evidence be treated as proof that Kadane stood ready, willing and able to drill, and would drill if he could obtain a lease (and excluding the Conglomerate) that *alone* would not constitute evidence which would support a judgment on the implied covenant to reasonably explore. There must be something more, as, for example, some character of proof that would eliminate the area as strictly "Wildcat" territory, and contrarily to establish it as premises upon which a reasonably prudent operator holding the leasehold estate would immediately drill without further investigation or delay. The evidence did not do this for outside the Con-

glomerate formation the character of the premises appears from the evidence to still be in the "Wildcat" category. There is no other known formation in the area from which any production might reasonably be expected.

■ Viewed from the "development" standpoint, with the exploration feature disposed of, it is to be remembered that the judgment of the trial court constructively denied appellant's prayer based upon the implied covenant therefor. In order for the appellant to have been entitled to judgment premised upon such a breach it would be required that she show that further drilling or reworking would be profitable (to lessees). We know that the reworking by the "sand-fracting" process was profitable, for it was resorted to before the suit was tried and so proved, thus proving also that it would have been wisely done at an earlier date. But of course the wisdom so proven was as a matter of hindsight rather than foresight, and the very operation eliminated any necessity for the trial court, to order such a reworking by appellees in its judgment, with forfeiture conditioned upon their failure in such respect. It may be that drilling another well into the known Conglomerate formation might be reasonable from a development standpoint. But before appellant would be entitled to have appellees ordered to "drill or forfeit" she would be obliged to prove and obtain a finding that such further drilling would be profitable to appellees. This finding was not obtained, and our review of the evidence satisfies us that such a finding was certainly not thereby compelled. The trial court's refusal to so find would therefore not be disturbed.

Though the judgment found that appellees breached the implied covenant to explore, the evidence failed to establish any unperformed duty to further explore for new producing formations under the lease. The evidence does not amount even to prima facie proof of any default in such respect on the part of appellees. See

article entitled "The Implied Covenant of Further Exploration", by C. J. Meyers, 34 T.L.R., p. 553, et seq., particularly at p. 581. A statement by the author seems exceedingly apropos, to-wit: "The covenant of further exploration need not become a lease-breaking device and will not become one if the courts exercise control over it."

We are of the opinion that appellees' cross-assignment must be sustained. The judgment, in so far as it requires present additional drilling as a condition to prevent forfeiture of any part of the leasehold estate, must be reversed and rendered in favor of appellees.

Reverting to appellant's points of error, it is noted that her fourth point is premised upon a contention that the trial court should have conditionally canceled the lease for breach of implied covenant to explore as to the interval in the Conglomerate formation between 5,300 to 5,600 feet instead of preserving the lease in appellees as to said interval. Since we have sustained appellees' cross-assignment as above and as result have reversed the judgment canceling any part of the lease, such fourth point becomes moot. The discussion in relation to the cross-assignment immediately preceding covers factors which would have been necessary of consideration in connection with said fourth point.

■ Appellant's third point contends that the trial court erred in failing to assess damages because of appellees' failure to earlier rework the existing gas well and to undertake further drilling in breach of implied covenants. Since we have held that the covenants were not proven to have been breached as to further drilling operations, the question would become moot as to such for there was no breach of duty upon which damages could be made to depend. Furthermore, in order for the remedy of cancellation to apply because of the breach of either implied covenant to develop or the implied covenant to explore, appellant would

be required to obtain a finding prerequisite to relief by way of cancellation that damages accruing to her because of the breach were impossible of ascertainment. Lido Oil Co. v. W. T. Waggoner Estate, Tex.Civ. App. Amarillo, 1930, 31 S.W.2d 154, error refused. Examination of the record reveals that any such damages accruing because the reworking procedure was not earlier performed could not be ascertained and were not proved with any degree of certainty. It was therefore proper to refuse to allow damages, the uncertainty going to whether appellant actually lost any benefit at all by delay. As applied to the reasonableness of the delay of the appellees in proceeding to rework the well prior to the time they performed the successful "sand-fracting" operation thereon, the evidence in the record is disputed. That in favor of appellees would have been sufficient to support a finding of the trial court refusing to declare that a breach had occurred. Furthermore, it would seem that under the Railroad Commission's "reservoir" theory as to gas, appellant would "have her cake and eat it too" if allowed damages, for ultimately she would not lose anything. The gas reservoir is being emptied and she will get her profit from the process. Of course, she has been delayed, but she has not proven with any degree of certainty her damages on account of the delay.

Appellant's first and second points basicly contend that the trial court erred in not holding that the lease had automatically forfeited in its entirety according to its express and implied terms because there was a period during which it had failed to produce oil and/or gas in paying quantities. The third and fourth points brought forward by appellant and heretofore mentioned are of course in the alternative to these now under discussion, as was the premise thereof in her pleadings and prayers for relief before the trial court. In other words, appellant's suit was to decree total cancellation through operation of law and the contract itself, subject to which it was to decree partial cancellation for breach of implied covenants to develop or explore.

It is noted that the lease instrument does not recite in terms that it shall continue (after production begins) so long as oil and/or gas, etc., are produced in "paying quantities". The terms quoted were absent from the language of the lease, and their implication is to be made from law applicable to such contracts. Summers Oil and Gas, Perm.Ed., Vol. 2, Ch. 10, "The Habendum Clause", sec. 306, " 'Paying Quantities' Defined". Forfeiture of the lease in this instance would not arise from consent through express provisions of contract because production therefrom was not sufficient to amount to "paying quantities". Rather would it be necessary to consider the term to be impliedly incorporated into the contract and as incorporated clothed with the semblance of contract for the purpose of the remedy of equitable forfeiture. The obligation does not arise from consent in this particular case, but from the law or natural equity. That being the case, the trial court was clothed with great latitude of discretion in deciding whether the existing well on the lease had or had not "ceased" to produce oil and/or gas "in paying quantities".

The question under appellant's first and second points is upon the matter of the meaning of the contract as necessarily implied and construed in relation to the habendum clause in a test to determine whether the oil and/or gas and mineral lease "ceased to produce in paying quantities" so as to work a forfeiture thereof to the lessor. This question was before the Supreme Court of this State in the case of Garcia v. King, 1942, 139 Tex. 578, 164 S.W.2d 509, 513. In such case the term "in paying quantities" was not recited in the lease, but was engrafted under legal principles as would be the case here. Chief Justice Alexander stated in that case, "Obviously, if the lease could no longer be operated at a profit (to lessees), there were

no fruits (from their investment) for them to reap. The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees." As we understand the foregoing language, together with the balance of the opinion, Judge Alexander held that production from a lease of oil and/or gas in paying quantities had ceased *when the lessee can no longer cause it to yield production profitable to him, and where its retention would be for mere speculative purposes in bad faith with respect to the contract of production.*

▊ Equity abhors a forfeiture, and within the limits permitted by the evidence in an individual case a trial court will not be compelled to decree forfeiture of a leasehold estate unless it be made to appear therefrom that any equitable condition or contingency upon which said estate is made to depend has indisputably failed and passed away as a support therefor. In the present instance, aside from the fact that the evidence, as viewed most favorably to the preservation of the leasehold estate, disclosed that the operation of the lease would result in a profit to lessees for a month or two, followed by a loss for a month or two, "see-sawing" in such manner over a period of some 16 months, with the average over this particularly unfavorable period falling slightly "into the red ink" on lessees' ledger, nevertheless, the evidence also established that production was so limited because of certain rules and regulations of the Texas Railroad Commission, and that but for said rules and regulations sufficient production could have been effected to show a profit.

▊ Certainly the trial court was entitled to take into consideration the effect upon the production from the lease in question of the rules and regulations aforesaid. Also during this period R. W. Koontz, the principal appellee in this case, was acquiring a majority interest in the leasehold estate and working diligently at arrangements to rework the well by the "sand-fracting" process, and also making application to the Railroad Commission to reclassify the well and make different rules and regulations apply in order that a greater production than formerly could be extracted. Mr. Koontz' efforts bore fruit before the time of the trial, and results thereof were in evidence. The increase in the production of gas was about 1800%, and this was very profitable.

▊ There would be no particular limit upon the number of days, weeks or months to be taken into consideration by the trial court in passing upon the question of whether paying production from the lease had ceased. Such would be a factor of consideration in determining the question, but in the absence of specific provisions of contract relative thereto the trial court as the arbiter in equity would be at liberty to consider such period of time as under the circumstances of the case would be reasonable and proper as a factor only, and not as the controlling element in the determination of the ultimate question.

▊ From our view of the evidence the trial judge, as the fact finder in the hearing in the trial court, was supported in its findings and judgment refusing to decree cancellation of the entire lease. The evidence did not compel a decree of forfeiture. We need not pass upon the question of whether the evidence would have supported a contrary holding.

▊ Reverting again to the appellees' cross-assignments, it is noticed that they contend that the trial court erred in granting appellant a default judgment as against certain non-appearing defendants named in her petition as same pertained to a trespass to try title action. This, they contend, because the citation served upon said defendants was accompanied by a copy of appellant's First Amended Original Petition when appellant thereafter amended her petition another time, going to trial against

appellees on the petition as last amended with no request for entry of default judgment against the absent defendants until after trial of the issues against appellees.

Appellees confess that they have found no decision upon the point. They cite instances wherein answer by one defendant inures to the benefit of a defaulting defendant, as this court had under consideration in the case of Leach v. Cassity's Estate, 1955, 279 S.W.2d 630, writ ref., n. r. e. But since as to appellant the obligation of the non-appearing defendants would properly be deemed several, or joint and several, and not merely joint (in view of the severance of fractional interests in the leasehold estate), we are of the opinion that appellees' answers do not inure to their benefit.

We are of the opinion that it was within the authority of the trial court to enter default judgment in trespass to try title against the non-appearing defendants upon the pleadings served upon them along with citation, and that the judgment which was entered divested them of such title, if any, theretofore appearing to have been in them. Appellant, as individual and executrix, now owns a percentage interest in the leasehold estate. We do not visualize the obligations she would owe incident to her ownership thereof to vary in any particular from those which would exist had she acquired the identical interest by purchase. The point of error is overruled.

Judgment affirmed as to that part which denies relief to appellant. Judgment reversed in so far as it decrees any relief to appellant as against appellees, and rendered in behalf of appellees.

On Motion for Rehearing

Counsel for appellants has submitted to us a most vigorous motion for rehearing which we have examined and studied to the extent of our capabilities, but which we have concluded must be overruled.

However, we do believe that the importance of the principles involved and the novelty of the questions presented warrant recognition at this time because of the near certainty of litigation to come involving situations like unto that in the instant case.

Our attention has been called to an excellent analysis of the field within which our scope of inquiry largely falls. It is entitled "The Habendum Clause as a Special Limitation on Oil and Gas Leases in Texas", by Ivan Irwin, Jr., found in Volume XI, Number 3 (Summer, 1957) Southwestern Law Journal. At page 344 the author states the question: "Over what period of time is the production to be measured in determining whether production has been in paying quantities?" He states that (as of the date of publication) the problem has not been resolved by the courts. We have based our own conclusions and our holding upon an evaluation of what we believe Judge Alexander necessarily held in the case of Garcia v. King, 1942, 139 Tex. 578, 164 S.W.2d 509. We agree with Mr. Irwin, however, that the question has not been resolved heretofore, and is not to the present time, even assuming the verity and soundness of our foregoing opinion.

The motion for rehearing is overruled.

Appellants have conditionally submitted a motion to certify in the event motion for rehearing is overruled. Although we have overruled the motion for rehearing, we are not disposed in this instance to grant their motion. The motion to certify is overruled.