Georgie Nell Becknell FICK et vir et al.,
Appellants,

v.

J. H. WILSON et al., Appellees.

No. 7348.

Court of Civil Appeals of Texas.
Texarkana.

Sept. 5, 1961.

Rehearing Denied Oct. 3, 1961.

Furrh & Peteet, Marshall, LeRoy La-Salle, Carthage, for appellant.

Turner & Bankhead, Carthage, Abney, Abney & Baldwin, Marshall, for appellee.

PER CURIAM.

This is an action for declaratory judgment determining the status of certain Oil, Gas and Mineral Lease instruments, the rights of parties thereunder, and their legal relationship, duties and liabilities. A take nothing judgment, with certain orders made under the equitable powers of the court, was entered, and is affirmed.

Excepting Alfred E. Lacy, Jr., the appellants, plaintiffs in the trial court, as lessors, conveyed to A. G. Birdwell, as lessee, an oil, gas and mineral leasehold interest in a one hundred acre, more or less, tract of land in the Eliza Williams Survey of Panola County, by an oil, gas and mineral lease instrument dated December 17, 1954. The lease was for a primary term of three years and as long thereafter as oil, gas and other minerals were produced, with a clause that after discovery of oil, gas or other minerals, should production cease from any cause, the lease would not terminate if the lessee commenced additional drilling or reworking operations within 60 days after cessation of production. This, the Birdwell lease, the appellants would have declared terminated. The appellees, the successors in title of A. G. Birdwell, as defendants, prevailed in the trial court.

On June 3, 1959, the same lessors named in the lease to Birdwell, by a similar instrument, conveyed to Alfred E. Lacy, Jr., as lessee, the same oil, gas, and mineral leasehold estate described in the Birdwell lease. Thereafter on June 23rd they executed a ratification of the Lacy lease. These instruments constitute the Lacy lease and evidence his claim of title. Appellants seek judgment declaring the instrument date June 23 to be a valid operative lease.

The basis of the appellants' suit is that the primary term of the Birdwell lease expired December 18, 1957, and production of oil in paying quantities from the leased land ceased on or about March 1, 1959, terminating the lease and effecting a reversion of title.

Following a non-jury trial the Judge made and filed several findings of fact and conclusions of law. One of the findings relative to cessation of production was that a well on the leased land was producing oil in paying quantities from the date of the expiration of the primary term of the Birdwell lease, that is, December 17, 1957, to May 13, 1959, the date production admittedly completely ceased before being recommenced on June 29, 1959.

The appellants assail the mentioned finding, as well as other findings, as having no support in the evidence, and being against its overwhelming weight and preponderance. This finding, if based upon sufficient evidence, supports the take nothing judgment. The attack does not question sufficiency of production before March 1, 1959 or after June 29, 1959, but centers on the period of time between March 1 and June 29, as being a period of more than sixty days in which oil was not produced from the lease in paying quantities.

Wells designated as Becknell No. 1 and No. 2 were drilled in development under the terms of the Birdwell lease. Both produced oil, but the No. 1 well had ceased production long before the time involved in this litigation, and it is mentioned only to account for its absence as a factor in the case. The No. 2 well was being operated as a producer until March 17, 1959, when reworking operations were begun. At that time the pump rods were pulled, paraffin cut and a new pump placed on the well. The work consumed two days. At completion the pump installation was not put in operation for want of electrical power to operate it. Electric service had been discontinued for non-payment of accrued charges. The service was restored

June 29, 1959, a period of one hundred ten days after pump shutdown March 17.

The No. 2 well, though completed as a pumper, would flow without mechanical assistance by reason of reservoir gas pressure when it was first completed, and this pressure caused it to continue to flow to some extent until May 13, 1959. The flow at the period with which this suit is concerned was small; it came in heads; that is, enough pressure would build up every few days to cause the well to flow two or three, sometimes as much as five, barrels per day. The switcher who operated the lease for the owner at 2 to 3 day intervals flowed and saved as much as twenty-five barrels of oil between March 17 and May 13.

On May 13 the switcher was treating an accumulation of oil in the tank readying it for delivery to the pipeline when a leak at the firebox made necessary a shutdown of all operations and the disconnection of lines from the well to the tank. Between May 13 and June 29 no oil was taken from the well.

Oil production, its value, transportation expense and taxes for the period beginning July 19, 1958 and ending September 10, 1959, when suit was filed is shown in the following table:

|  | Bbls. | Gross Value | Transp. Chgs. | Tax | Net Value |
|---|---|---|---|---|---|
| **1958** |  |  |  |  |  |
| July | 1,392.39 | 4,370.39 | 180.99 | 195.31 | 3,994.09 |
| August | 1,460.52 | 4,590.59 | 189.88 | 205.16 | 4,195.55 |
| September | 966.18 | 3,043.47 | 125.60 | 136.40 | 2,781.83 |
| October | 1,314.47 | 4,140.58 | 170.89 | 185.70 | 3,784.62 |
| November | 493.27 | 1,553.81 | 64.13 | 69.45 | 1,420.23 |
| December | 259.74 | 818.18 | 33.77 | 36.57 | 747.84 |
| **1959** |  |  |  |  |  |
| February | 248.81 | 783.75 | 32.35 | 35.02 | 716.38 |
| March | 243.63 | 767.44 | 31.68 | 34.30 | 701.46 |
| March | 208 |  |  |  |  |
| July | 386 |  |  |  |  |

Transportation charges, taxes and the switcher's fee of $100 per month, an electric bill of $141.35 and a butane gas bill of $31.81 are the expense items incident to lease operation incurred during the period of production shown.

The appellants contend that the evidence is overwhelming that only twenty-five barrels of oil, having a market price of $2.85 per barrel, were produced and saved from the lease between March 17 and June 29. They then reasoned that the value of this oil, less royalty and the cost of production, conclusively show that the lease was not producing oil in paying quantities during such period of time. This, because of the evidence that the switcher was being paid by contract $50 per well per month, a total of $100 per month to operate the lease, such expense, disregarding all other cost of operation and the payment of royalty, was far in excess of the value of oil produced and saved during that time period.

In support of their contention of a failure of production in paying quantities and a resultant termination of the Birdwell lease the appellants rely principally on Gulf Oil Corporation v. Reid, Tex., 337 S.W.2d 267;

and Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783.

The Reid case concerned a gas well that was capable of producing gas but which had never been placed in production. The Supreme Court held that as *there had been no production* of gas *it did not cease to produce* in paying quantities and the lease clause giving an additional 60 days after cessation of production to begin reworking or further drilling had no application. The factual basis of Reid case is so dissimilar to that now before the court that it is not thought determinative of the problem under consideration.

■ With reference to a producing well, the Rochmill case avouches the rule to be that cessation of production after termination of the primary term automatically terminates a lease similar to that in this case, but that a temporary cessation of production due to mechanical breakdown or the like does not. See also Scarborough v. New Domain Oil & Gas Co., Tex.Civ.App., 276 S.W. 331, w. dis.; Texas Pacific Coal & Oil Co. v. Bratton, Tex.Civ. App., 239 S.W. 688, n. w. h. The term "produced", when referring to minerals in such leases, has substantially the same meaning as "produced in paying quantities". Garcia v. King, 139 Tex. 578, 164 S.W.2d 509. Production of oil is in paying quantities when income from its sale, exceeds the costs of the operation necessary to produce it. Garcia v. King, supra, and Holchak v. Clark, Tex.Civ.App., 284 S.W.2d 399, err. ref.; Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W. 2d 339; Cox v. Miller, Tex.Civ.App., 184 S.W.2d 323, err. ref. However, on this question Clifton v. Koontz, Tex., 325 S.W. 2d 684 makes profit or loss from current operation only a relevant factor to be considered with all other evidence. In that case the Supreme Court laid down the general rule that once production is begun a well is producing in paying quantities when, considering all relevant facts, a reasonably prudent operator would continue the production operation for the purpose of making profit from the oil produced; and took the occasion to assert that relevancy to the issue is the only limit to the period of time to be taken into consideration in determining whether or not paying production from the lease has ceased.

■ Mindful of the foregoing principals the facts developed in the trial court will be analyzed in accordance with the rule concerning review on appeal of evidence said to support a trial court's finding of fact, mentioned in such cases as Manning v. Barnard, Tex.Civ.App., 277 S.W.2d 160, n. r. e.; Banks v. Crawford, Tex.Civ.App., 330 S.W.2d 243, n. w. h.; Bavousett v. Bradshaw, Tex.Civ.App., 332 S.W.2d 155, n. r. e. So doing, evidence is found in the record which in its most favorable aspect supports the challenged finding of fact. To summarize, there is evidence that for a period of over 9 months preceding June 13th, the date the well was shut in, the well was regularly produced without lapsation of as much as 60 days and the income from such production after deduction of royalty was substantially in excess of the costs of operation. Reworking was undertaken March 17 to increase the well flow, and though electric power to the well was disconnected, some oil was produced by reservoir pressure and run into tanks before the well was shut in completely on May 13. Later, on June 29, electric service was restored and production was recommenced in such volume that no argument is made that production after that date was not in paying quantities.

For appellants to prevail, it would have to be held as a matter of law that production for the 9 month period preceding May 13 had no probative value relevant to the issue of production in paying quantities. Clifton v. Koontz forbids such conclusion; and to the contrary, supports the view that such evidence is relevant and material.

No reversible error is shown. The appellants several points are overruled and the judgment of the trial court affirmed.