Zeta BELL et al., Appellants,

v.

MITCHELL ENERGY CORPORATION et al., Appellees.

No. 16820.

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 7, 1977.

Rehearing Denied May 5, 1977.

William J. Merrill, Kelley, Ryan & Merrill, Houston, of counsel, for appellants.

Paul A. Smith, Smith & Fulton, Ben H. Rice, Vinson & Elkins, Houston, of counsel; James H. Whitcomb, Columbus, for appellees.

EVANS, Justice.

This action to cancel an oil and gas lease was brought by the appellants, who are the heirs and successors in interest to the original lessors, against the appellees, the present owners of the leasehold working interest. The appellants contend that the one producing well on the leased premises ceased to produce in paying quantities and that the appellees failed to maintain the lease in effect by the commencement of drilling or reworking operations under the 90 day clause of the lease. These issues were submitted to the jury which failed to find either that there had been a cessation of production in paying quantities or a complete cessation of production for a period of more than 90 days. On the basis of the jury's verdict, the trial court entered judgment in favor of the appellees, declaring the oil and gas lease to be in full force and effect. Its judgment will be affirmed.

The oil and gas lease in question, executed in 1939, covers 695 acres of land in Colorado County, Texas. It has been maintained in effect by production after the expiration of its ten year primary term. In 1962 Mr. A. H. Wadsworth, Jr., acting under a farmout assignment from the appellees and their predecessors, drilled the subject well, known as the "McDermott No. 1" or the "Wadsworth No. 1." At the time Wadsworth drilled this well the lease was being maintained in effect by production from a gas well on the north half of the lease, but that well ceased to produce in 1969, and thereafter the lease was held solely by production from the Wadsworth well. The production from the Wadsworth well has been sold pursuant to contract with Tennessee Gas Pipeline Company. This contract was renewed by Wadsworth effective January 1, 1973, with a price increase from 16¢ per MCF to 24¢ per MCF, conditioned on Federal Power Commission approval. On March 27, 1973, Wadsworth requested FPC's approval of the increased gas price, and this request was granted by the FPC on June 12, 1973, effective retroactively to April 30, 1973. Tennessee Gas authorized payment to Wadsworth in June 1973, at the increased price rate effective to April 30, 1973, but according to Wadsworth's testimony he did not learn that the price increase had been approved until after he had decided to abandon the well and reassign his interest to the appellees. On October 1, 1973, Wadsworth ceased operation of the well and his compressor was moved from the well site. On October 18, 1973, he agreed to furnish a recordable reassignment of his interest and authorized the appellees to assume operation of the well while the assignment was being circulated for execution among his associates. In July 1974, the assignment had not been returned by Wadsworth's associates, and he executed a new assignment which had been prepared for his execution by appellees. No royalty payments were tendered to the

appellants from the time Mr. Wadsworth relinquished operation of the well until after this suit was filed in October 1974. The Wadsworth well continued to produce gas until May 1975, when the producing zone became depleted, and in August 1975, the well was reworked and production of gas was obtained from another zone. Thereafter the well has produced gas in paying quantities without requirement of a compressor.

The jury was submitted three issues pertaining to the appellants' contention that the Wadsworth well had ceased to produce in paying quantities.

### SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the McDermott No. 1 (Wadsworth No. 1) Well ceased to produce in paying quantities during any period of time, as herein defined, between September 1, 1971, and May 9, 1975? "In your determination of whether production in paying quantities from the McDermott No. 1 (Wadsworth No. 1) Well ceased, you are instructed by the Court that there is no arbitrary period as to time, whether days, weeks or months, to be taken into consideration in determining the question of whether production in paying quantities from the lease has ceased.

"Answer: 'Yes' or 'No.'

"Answer: _No_ .

"If you have answered Special Issue No. 1 'yes', and only in that event, then Answer Special Issue No. 2.

### SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that a reasonably prudent operator would have discontinued the operation of the well under the circumstances at the time considered by you in your answer to Special Issue No. 1, if you have answered such Special Issue 'Yes'?

"Answer: 'He would have discontinued operation' or 'He would not have discontinued operation'.

"Answer:_____.

"If you have answered Special Issue No. 1 'Yes', and Special Issue No. 2 'He would have discontinued operation', and only in that event, then answer Special Issue No. 3.

### SPECIAL ISSUE NO. 3

"When do you find from a preponderance of the evidence that the said well ceased to produce in paying quantities, if you have so found.

"Answer When:_____."

Since the first special issue was answered, "No", and since the second and third special issues were conditionally submitted, the jury made no response to the second and third issues.

The appellants first contend that the evidence established, as a matter of law, that the Wadsworth well would not produce in paying quantities and that the trial court erred in overruling their motion for judgment. In related points appellants attack the legal sufficiency of the evidence to support the jury finding to Special Issue No. 1 and contend that such finding is against the great weight and preponderance of the evidence. Appellants also contend the trial court erred in refusing to instruct the jury that the term "paying quantities" should be determined in the light of what a reasonably prudent operator would do under all relevant circumstances.

The appellants rely principally upon the testimony of two expert witnesses.

Mr. Wadsworth, who had drilled and operated the well, testified that the well showed an accounting loss in the aggregate amount of $412.00 for the first nine months of 1973, based upon a gas price of 16¢ per MCF. In May 1973, he had notified appellees that he intended to abandon the well, but after his May runs came in, he found he had made a profit, and he decided to hold the lease "a little bit longer." Accordingly he kept the lease until September when he gave notice of his intent to abandon his interest. Wadsowrth was permitted to state his opinion that "at that time" the

lease was no longer capable of producing in paying quantities. However, when asked whether he would have changed his opinion if, at that time, he had known of the price increase, he replied that he would have to go back and figure the matter again, that at that time his opinion was that he had "carried it long enough."

Mr. Paul E. Cameron, Jr., a petroleum engineer, was permitted to give his opinion, based upon the appellants' schedule of income and costs for the period of January 1973 through September 1973, that the well would not produce in paying quantities. This schedule was based upon the 16¢ per MCF price factor and it did not take into consideration the retroactive application of the increased gas price to April 30, 1973.

The period of time covered by Special Issue No. 1 was September 1, 1971 through May 9, 1975. There was evidence before the jury that during each calendar year within said period of time, the aggregate amount of income from the well exceeded the expense of operation. There was evidence that the well made a profit of $5,437 for the four month period beginning September 1, 1971 and ending December 31, 1971; a profit of $6,825 for the calendar year 1972, although accounting losses were shown for the months of January, September and November of that year; a profit of $3,008 for the calendar year 1973 (based upon the increased gas price computed retroactively to April 30, 1973) although accounting losses were shown for the months of February, March, April and October of that year; a profit of $8,675 for the calendar year 1974; a profit of $1,679.00 for the first three months of 1975, and a loss of $161.00 for the month of April 1975. Thus, although there were various months within the period of time covered by the first special issue for which accounting losses were shown, a net annual profit was indicated for each calendar year for said period of time.

■ The burden of proof was upon the appellants to prove first that the well was not making a profit, and if that burden was met, to prove that a reasonably prudent operator would not have continued to operate the well under the circumstances. *Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774 (1962). A mathematical loss occasioned during certain months of a lease does not automatically establish the fact that the lease is not being held by production in paying quantities. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959).

"If a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable." 325 S.W.2d 684, 691.

If the well is making a profit, it is producing in paying quantities. If the well is marginal, it may still be producing in paying quantities if a reasonably prudent operator, under all relevant circumstances, would continue the operation. *Clifton v. Koontz,* supra.

■ The jury could properly have concluded from the evidence that the well actually made a profit during the period of time inquired about in the first special issue. The increased gas price became effective April 30, 1973, and royalties were subsequently paid on the basis of the increased price. The jury was entitled to take such increased price into consideration, even though the operator may not have been aware of the price increase until after he elected to reassign his interest to the appellees.

The jury was not required to accept the opinion testimony of the expert witnesses in deciding the ultimate issue of whether the well ceased to produce in paying quantities. Based upon the evidence presented, the jury was justified in determining that the evidence failed to establish that the well had ceased to produce in paying quantities, and the jury's finding in that respect is not against the great weight and preponderance of the evidence. Since the jury failed to find that the well had ceased to produce in paying quantities, the question was not reached as to whether a reasonably prudent operator, under all relevant circumstances, would have discontinued operations.

■ The appellants next complain that the trial court erred in striking certain testimony of the witness Cameron, stating his opinion that the well had ceased to produce in April, May, June, and July of 1975. Prior to striking this testimony, the trial court had ascertained that the witness lacked familiarity with the factors which, under the law, must be considered in the determination of whether there is production in paying quantities and that the witness' opinion was based solely on the data contained in the exhibit before him. The test for receiving opinion testimony of experts is whether the jury can receive any appreciable aid from the testimony. McCormick & Ray, Texas Law of Evidence, Section 1400, p. 234. The exhibit forming the basis for the witness' expert opinion was before the jury, and the jury could have readily ascertained for itself the same information which appellants sought to elicit from the witness. Furthermore, since the question posed to the witness covered the months of May, June, and July 1975, the witness' response was not relevant to the same period of time inquired about in the first special issue. The appellants have not demonstrated that the trial court's action in striking this testimony constitutes reversible error.

The appellants next contend that the evidence conclusively established that the well did not produce in paying quantities for the month of April and the first seven days of May 1975, and that there was a complete cessation of production thereafter until production was restored on August 12, 1975. It is the appellants' position that the appellees failed to comply with the lease clause providing that the lease will not terminate due to cessation of production if within 90 days the lessee commences additional drilling or reworking operations.

The burden of proof was upon the appellants to establish that there had been a cessation of production for a period of 90 consecutive days without additional drilling or reworking operations by the lessee. The evidence does not conclusively establish this issue in favor of the appellants, nor was the issue judicially admitted by the appellees as contended by the appellants.

■ The record shows that expenses exceeded income from production for the month of April 1975, but this does not compel a finding that at that time there was a cessation of production which required the lessee to commence drilling or reworking operations under the 90 day clause.

". . . to apply the . . . clause as contended by petitioners would mean that respondents would have been required to immediately commence drilling operations upon sustaining a slight loss for one month, without regard to whether they believe the next month's production might be profitable for the reason that if they were in error and suffered another slight loss, the lease would terminate . . ." *Clifton v. Koontz,* supra, 325 S.W.2d at 690.

Since the jury failed to find that the well had ceased to produce in paying quantities during the period ending May 9, 1975, the trial court was not called upon to determine the applicability of the 90 day clause to any period of time beginning prior to that date. *Clifton v. Koontz,* supra.

The evidence is undisputed that the well continued to produce some gas until May 13, 1975 when its producing zone of gas was depleted, and that operations for reworking the well were commenced on August 6, 1975, which resulted in the production of gas from another zone.

Mr. Melvin J. Sims, called as an adverse witness by the appellants, testified that according to his pressure gauge charts, the Wadsworth well produced gas through May 8, 1975 and again produced gas on May 13, 1975. According to these records the well produced 75 MCF on May 1; 70 MCF on May 2; 65 MCF on May 3; 60 MCF on May 4; 60 MCF on May 5; 50 MCF on May 6; 50 MCF on May 7, and 40 MCF on May 8. There was apparently no production on May 9, 10, 11, or 12. On May 13 Sims' foreman, Dan Webel, checked the well, found an obstruction in the flow line, and restored production. The production was commenced at 4:15 p. m. on May 13, and ended at 2 a. m. on May 14, with a total showing of 30 MCF for that date.

Mr. Dan Webel testified that he went to the well site on May 13, and found the flow line plugged up with sand and formation solids. He said he removed the stem from the adjustable choke on the heater, took the flange off the orifice plate, and permitted the oil pressure to blow the obstructions out of the flow line. He then put it all back together, started up the compressor and "put it down to sales." He had the pump on production about 3:30 that afternoon and it flowed until about 2 a. m. the next day.

Mr. Webel also testified that on August 5, 1975, he arranged for a steel tank on skids to be moved onto the well site to handle fluids needed for the workover operations. The following day, August 6, 1975, the tank was actually moved onto the well site by Stone Well Service. Webel also arranged with O'Neal Lundy Vacuum Service to have the workover fluid hauled to the well site, and this was done on August 7, 1975. On August 8, 1975 the tool pusher, Mr. Emil Kucera, and his workover rig arrived on the well site and commenced reworking operations which resulted in a gas producing well on August 11, 1975. The workover rig was released on August 12 and on August 13 production equipment changes were made so that the gas could bypass the compressor and run directly to the sales meter.

Mr. Webel's testimony was substantially corroborated by the testimony of the service company personnel who performed the reworking operations, and the testimony of both Sims and Webel has not been contradicted in any material aspect by the appellants.

The appellants did not request submission of a special issue inquiring whether there had been a cessation of production for more than ninety consecutive days during the period May 8, 1975 to August 13, 1975. The trial court, therefore, submitted only one special issue to the jury in connection with the 90 day clause.

SPECIAL ISSUE NO. 4

"Do you find from a preponderance of the evidence that the McDermott No. 1 (Wadsworth No. 1) Well did not produce any gas for a period of more than ninety (90) consecutive days during the period of time between October 1, 1973, and March 31, 1974?

"Answer: 'Yes' or 'No.'

To which the jury answered "No."

The appellants contend that the trial court erred in overruling their objection to this special issue on the ground that the issue erroneously excluded from the jury's consideration the period May 8, 1975 to August 13, 1975.

All the evidence in the record shows that reworking operations were commenced within a period of 90 days following cessation of production, and there is no evidence to the contrary. Although the testimony presented on this issue was principally that of appellees' employees, their testimony was corroborated by other witnesses and by charts and records made in the regular course of business. The appellants have not seriously questioned the accuracy of the evidence with respect to this issue, and the evidence conclusively shows that reworking operations were timely commenced and prosecuted with diligence toward the completion of a producing well.

■ It is undisputed that the steel tank was moved on the well site on August 6, 1975 and that reworking operations promptly followed with gas production being obtained only six days later. The moving of machinery and equipment on the premises preparatory to the beginning of actual drilling or reworking, when performed with a bona fide intent to proceed thereafter with diligence toward the completion of a producing well, constitutes the commencement of operations within the meaning of the lease clause. *Petersen v. Robinson Oil & Gas Co.,* 356 S.W.2d 217 (Tex.Civ.App.—Houston 1962, no writ). Even if it be assumed that the well ceased to produce on May 8, 1975 rather than on May 13, the date of last actual production, the reworking operations commenced on August 6, 1975 were timely under the 90 day clause.

 The trial court did not err in overruling appellants' objection to Special Issue No. 4 even if the evidence should be considered sufficient to raise a fact issue with respect to the period of time from May 8, 1975 to August 13, 1975. The issue was one upon which the appellants had the burden of proof, and since appellants failed to request an issue in substantially correct form covering this period of time, the issue must be deemed waived. Rule 279, T.R.C.P. The issue which was submitted by the court related to an entirely different frame of time than that specified in the appellants' objection, and the objection did not suffice as a request for the submission of an issue with respect to the subsequent period of time. *Avant v. Gulf Coast Investment Corporation,* 457 S.W.2d 134 (Tex.Civ.App.—Dallas 1970, no writ).

It is further ruled that the trial court did not err in refusing the series of special issues requested en masse by the appellants, even though several such issues may have correctly stated certain elements of the controlling issue. McDonald, Texas Civil Practice, Vol. 3, Section 12.34.1, p. 429; *Thompson v. Robbins,* 157 Tex. 463, 304 S.W.2d 111, 118 (1957).

The appellants' last point raises the question of whether the trial judge committed reversible error in the conduct of the trial. The appellants contend they were prejudiced by the trial court's comments on their witnesses, their counsel and the weight of the evidence and that the cumulative effect of the trial court's actions was so harmful that the injury could not be cured by instruction.

 The testimony of the trial covers 1151 pages. For the most part the trial court's remarks were appropriate and were directed toward expediting the orderly process of the trial. In one instance the trial judge improperly remarked that he did not see the relevancy of certain records which had been admitted in evidence. In another instance the court expressed its views about the content of a particular exhibit, but after a discussion with counsel out of the presence of the jury, the court issued an instruction to the jury to disregard its prior comment. Although some of the trial court's comments were not proper, the appellants have not demonstrated that the trial court's actions, singularly or collectively, constitute such a denial of their rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. McDonald, Texas Civil Practice, Vol. 3, Section 11.20.1–2; Rule 434, T.R.C.P.

The judgment of the trial court is affirmed.