**Fred PSHIGODA, et al., Appellants,**

v.

**TEXACO, INC., Appellee.**

**No. 07–84–0229–CV.**

Court of Appeals of Texas, Amarillo.

Jan. 29, 1986.

Rehearing Denied Feb. 19, 1986.

Mitchell Ehrlich, Lemon, Close, Shearer, Ehrlich & Brown, Perryton, for appellants.

Robert P. Thibault, Houston, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

COUNTISS, Justice.

This is a suit to cancel an oil and gas lease. The mineral owners and appellants, the Pshigoda family, sued the leaseholder and appellee, Texaco, Inc., contending Texaco was holding the lease by two oil wells that were not producing in paying quantities. Appealing from a take-nothing judgment rendered after the jury failed to find facts essential to their recovery, the Pshigodas advance four points of error that present two determinative issues:[1] (1) did the trial court err by telling the jury to exclude reworking costs when determining operating and marketing costs, and (2) did the trial court err by submitting two time periods for jury consideration, one before and one after suit was filed, instead of one time period? We affirm.

---

1. The Pshigodas' brief contains five points of error. However, their counsel waived the sec-

ond point of error during oral argument.

In 1946, the Pshigodas' predecessor in title leased a section of minerals to Texaco's predecessor in title, for ten years "and as long thereafter as oil, gas or other mineral is produced" from the land. Texaco has held the lease under the production clause since the expiration of the primary term, and presently has two oil wells on the leasehold, Pshigoda Number One completed in 1958 and Pshigoda Number Two completed in 1974. The wells are not major producers, but have had periods of profitability.

In 1981, Number One developed a casing leak that caused it to produce substantially more saltwater than oil. Texaco eventually repaired the leak by "squeeze cementing" the well,[2] at a cost of approximately $89,000.00.

On December 13, 1982, while Texaco was contemplating the drilling of another well on the leasehold, the Pshigodas filed this suit. They alleged, and at the trial presented evidence, that the two wells were not producing enough oil and casinghead gas to be profitable after deduction of operating and marketing expenses and that a reasonably prudent operator would not continue to operate the lease. Texaco presented controverting evidence and the jury agreed with Texaco (or, at least, did not agree with the Pshigodas by a preponderance of the evidence).

One key item of evidence, and the heart of the first controversy here, is the treatment of the $89,000.00 expenditure to plug the leak in Number One's casing. If it is treated as an operating and marketing expense, the leasehold had a net loss in excess of $69,000.00 from January 1, 1981 through February 1984. (Trial was in May 1984.) If the expenditure is excluded from consideration as an operating and marketing expense, the leasehold had a net profit in excess of $20,000.00 for the same time period.

Witnesses who discussed the expenditure agreed that it was a capital expenditure.

The Pshigodas' expert witness called it a "sunk cost" and a "capital investment for the repair of that well." Texaco witnesses characterized the expense as a "workover to repair a capital item" and "an extraordinary item which is not a normal operating expense." One witness also said the expense was "absolutely not" an operating cost or a cost directly attributable to the operation of a lease.

The trial court gave the jury the following instruction on reworking expenses:

In this connection, you are instructed that the words "at a profit" mean that the income to Texaco, Inc. must be sufficient to pay Texaco a profit, though small, over operating and marketing expenses.

In determining "operating and marketing expenses" as that term is used in this charge, if any there be, you may consider such expenses as taxes, overhead charges, labor, repairs, depreciation on salvable equipment, if any, and other such items of expense, if any. In this connection, *you are instructed not to consider any costs or expenses in connection with* the original drilling and equipping of the well or *a reworking of the well.* (Emphasis added.)

We will first resolve point one, by which the Pshigodas question the propriety of the foregoing instruction and point three, by which they contend the instruction was a comment on the weight of the evidence. They argue that the instruction was fatal to their case because it permitted the jury to exclude the $89,000.00 casing repair item when determining whether the leasehold was profitable. Thus, the basic inquiry is whether it was error to tell the jury it must exclude reworking expenses in deciding whether the wells operated at a profit, *i.e.,* whether as a matter of law reworking expenses are excluded in deciding whether a well is profitable.

**2.** Squeeze cementing is a process by which a plug is placed below the casing leak, a packer is placed above the casing leak, and cement is pumped between the two and forced into the holes in the casing. The packer is then removed and the cement is drilled out.

■ Although no Texas case is precisely in point, the controversy can be resolved within the framework of three cases: *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509 (1942); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959); and *Skelly Oil Company v. Archer*, 163 Tex. 336, 356 S.W.2d 774 (1961). *Garcia* rejected the notion that production will keep a lease in force indefinitely under the habendum clause regardless of the profitability of the production. Instead, said the Court, production means production in paying quantities. *Garcia* was followed by *Clifton v. Koontz, supra*, which refined the profitability test of *Garcia* and enunciated what is now considered a two-step test for determining a well's profitability: (1) does the production yield a profit after deducting operating and marketing costs, 325 S.W.2d at 692 [3] and (2) would a prudent operator continue, for profit and not for speculation, to operate the well as it has been operated. 325 S.W.2d at 691.[4] Central to the *Koontz* decision is the philosophy that fixed or periodic cash expenditures incurred in the daily operation of a well (sometimes called out-of-pocket lifting expenses) are to be classified as operating expenses, while one time investment expenses, such as drilling and equipping costs are to be treated as capital expenditures.

After *Koontz*, the Supreme Court decided *Skelly Oil Company v. Archer, supra*. In *Skelly*, the trial court defined paying quantities by telling the jury "that the gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well." 356 S.W.2d at 780. The Court then illustrated by example the meaning of operating and marketing expenses by telling the jury that it could "consider such expenses as taxes, overhead charges, labor, repairs, depreciation on salvable equipment, if any, and other such items of expense, if any. In this connection, you are instructed not to consider any costs or expenses in connection with the original drilling of the well." 356 S.W.2d at 781.

The Supreme Court approved the instructions, rejecting Skelly's argument that depreciation on salvable equipment, taxes, labor, and repairs should not be treated as operating expenses. It is again apparent, as in *Koontz*, that the Supreme Court considered operating costs to be the ordinary periodic expenses of production. However, none of the cases specifically considered the status of reworking costs.

The Court of Appeals decision in *Morgan v. Fox*, 536 S.W.2d 644, 650 (Tex.Civ.App.— Corpus Christi 1976, writ ref'd n.r.e.) is helpful, because the court specifically listed reworking expenses with drilling expenses in stating the items to be excluded when calculating whether a well is profitable. The status of reworking expenses was not directly in issue, however, so the statement must be treated as dictum. *See Ladd Petroleum Corp. v. Eagle Oil & Gas Co.*, 695 S.W.2d 99, 108 (Tex.App.—Fort Worth 1985, no writ).

When this case is analyzed within the framework of the foregoing principles, we are satisfied the trial court correctly instructed the jury. A reworking expenditure is analogous, and closely related, to the initial drilling expenses. It is usually a

**3.** The first test is stated as follows:

[T]he term "paying quantities", when used in the extension clause of an oil lease habendum clause, means production in quantities sufficient to yield a return in excess of operating costs, and marketing cost, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. The underlying reason for this definition appears to be that when a lessee is making a profit over the actual cash he must expend to produce the lease, he is entitled to continue operating in order to recover the expense of drilling and equipping, although he may never make a profit on the over-all operation.

**4.** The second test is stated as follows:

In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

one time, single expense item, that by the Pshigodas' own witness, is treated as a capital investment. Because it is not an ongoing expense, the operator may eventually recover it if the well continues to show a profit above normal operating expenses, just as the operator may eventually recover the initial drilling and equipment costs. Thus, it is logical and consistent with *Koontz* and *Skelly*, to permit the jury to exclude reworking expenses, as the trial court did. The instruction being proper, it follows that it was not an impermissible comment on the weight of the evidence. Tex.R.Civ.Pro. 277. Points of error one and three are overruled.

■ The second controversy in this Court revolves around the time frame by which the jury was allowed to measure profitability. The Pshigodas wanted to submit a single inquiry, covering the period from January 1, 1981 to March 1, 1984. However, the trial court asked the jury to make findings on two periods of time. It first asked the jury to find whether the leasehold was profitable from January 1, 1981 to December 12, 1982, the day before suit was filed, (the jury found that it was) and, if not, whether a reasonable operator would have continued to hold the leasehold for the purpose of making a profit and not merely for speculation. The court then submitted the same inquiries for the period from December 12, 1982 until March 1, 1984, shortly before the case was tried. (The jury failed to find that it was, but found that a reasonable operator would have continued to operate the lease for profit.) Based on the jury's answers, the court rendered a judgment favorable to Texaco in all respects.

By their fourth point of error, the Pshigodas attack the failure of the trial court to submit their requested special issue number one and accompanying instruction. The only viable argument under this point, after our rejection of their argument on reworking expenses, is the contention, that the court should have submitted the single accounting period for determining profitability—January 1, 1981 to March 1, 1984—

rather than two time periods, one encompassing 23½ months before suit was filed and the other encompassing 17 months between filing and trial.

The *Koontz* case, discussed in resolving points one and three, also provides the guidelines for resolving this point. *Koontz* states that the court is to determine profitability over "a reasonable period of time under the circumstances." 325 S.W.2d at 691. *See Ballanfonte v. Kimbell*, 373 S.W.2d 119, 121 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.); *Sullivan and Garnett v. James*, 308 S.W.2d 891, 893 (Tex. Civ.App.—San Antonio 1957, writ ref'd n.r. e.).

We are satisfied the time frames adopted by the trial court are reasonable. The first time period, encompassing the two years immediately preceding the filing of the suit is sufficient to give a picture of profitability over a reasonable length of time uninfluenced by the litigation. The second time period, slightly over a year and encompassing the period when litigation was pending, is also long enough to accurately reflect a profitability period and, additionally provide a contrast with pre-suit performance. Accordingly, point of error four is overruled.

By their fifth point, the Pshigodas say there is no evidence to support the jury's finding that the well operated at a profit during the first time frame. The argument is dependent, however, on treatment of the reworking expenses as operating expenses. Our rejection of that argument is necessarily fatal to the point. Accordingly, point of error five is overruled.

The judgment is affirmed.