Joe Lee EVANS, et al., Appellants,

v.

**GULF OIL CORPORATION,**
et al., Appellees.

No. 13–91–008–CV.

Court of Appeals of Texas,
Corpus Christi.

May 28, 1992.

Rehearing Overruled Nov. 17, 1992.

B.J. Walters, Jr., Nathan, Wood & Sommers, Houston, Ron O. Norwood, Taylor & Norwood, Liberty, Frank B. Sheppard, Crain & Sheppard, Errol John Dietze, Dietze & Reese, Cuero, Drew M. Capuder, Nathan, Wood & Sommers, Houston, for appellants.

Lloyd R. Cunningham, Leslie Kiefer Amann, Reynolds & Cunningham, Houston, Len Wade, J. Patrick Murphy, Haynes & Boone, Fort Worth, Gregory M. Cokinos, Cokinos & Bosien, Houston, H.E. Ellis, Dallas, John D. Murphree, Anderson, Smith, Null & Stofer, Victoria, William D. Granberry, David J. Demars, Valerie Fogleman, Gary, Thomasson, Hall & Marks, Corpus Christi, Morgan L. Copeland, Jr., James D. Thompson, III, Vinson & Elkins, Houston, Knute L. Dietze, Victoria, James P. Pennington, Morgan L. Copeland, Scott, Douglass & Luton, Houston, Dan Matthews, Zana Hill, Wendell W. Hall, Fulbright & Jaworski, San Antonio, Sabrina L. DiMichele, Houston, for appellees.

Before NYE, C.J., and SEERDEN and GERALD T. BISSETT[1], JJ.

## OPINION

SEERDEN, Justice.

Plaintiff/appellants challenge a summary judgment in their suit seeking a declaratory judgment that certain oil and gas leases had terminated and that defendant/appellees own no interest in the mineral estate, as well as damages for taking hydrocarbons after the alleged termination. Appellants contend that the leases lapsed under their habendum clauses due to failure to produce in paying quantities during two specific time periods. Appellees' summary judgment motion[2] averred that the well had then produced in paying quantities, and attached evidence to show profitability. Appellants responded, and claim to have raised genuine issues of material fact on the propriety of those calculations. We affirm the trial court's judgment.

Appellants own mineral interests in either the 91–acre Schorlemmer Tract or the 220.4–acre Thieme Tract. The Thieme lease was executed in 1951, the Schorlemmer lease was executed in 1956, and both tracts were pooled into a unit in 1958. Appellees claim either working interests or overriding royalty interests (as assignees from the working interests the original leases created).

In 1958, Harkins completed the Thieme Well (also known as the Thieme Heirs Well or the Harkins Well), a gas well still producing at the time of suit, on the Thieme Tract. Appellants alleged that appellees failed to produce in paying quantities from January 1981 through April 1982 and from June 1983 through December 1984, and that the lease thus lapsed. Apache Corp. completed the Elena Haun No. 1 Well on the Thieme Tract in February 1986, and this suit was filed in March 1986. Appel-lants seek damages for all the gas removed since the lease allegedly lapsed.

The burden is on the movant to show entitlement to judgment as a matter of law. *Goswami v. Metropolitan Sav. & Loan Ass'n,* 751 S.W.2d 487, 491 (Tex. 1988); *Mendez v. International Playtex, Inc.,* 776 S.W.2d 732, 733 (Tex.App.—Corpus Christi 1989, writ denied). A defendant moving for summary judgment must show as a matter of law that the plaintiff has no cause of action against him. *Citizens First Nat'l Bank v. Cinco Exploration Co.,* 540 S.W.2d 292, 294 (Tex.1976). The defendant must show that an essential element of the plaintiff's cause does not exist, or the defendant must establish an affirmative defense as a matter of law. *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 537 (Tex.1975).

When necessary to establish a fact issue, the nonmovant must expressly present to the trial court its reasons to avoid summary judgment, and present summary judgment proof. *Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 907 (Tex.1982). In deciding whether a disputed material fact issue precludes summary judgment, we indulge every reasonable inference in favor of the nonmovant. *Goswami,* 751 S.W.2d at 491.

The habendum clause in each lease stated that the lease was for a set primary term "and as long thereafter as oil, gas, or other mineral is produced from said land hereunder, or drilling or reworking operations are conducted thereon." In this clause, "produced" means "produced in paying quantities." *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511 (1942); *Bales v. Delhi–Taylor Oil Corp.,* 362 S.W.2d 388, 390–91 (Tex.Civ.App.—San Antonio 1962, writ ref'd n.r.e.); *Fick v. Wilson,* 349 S.W.2d 622, 625 (Tex.Civ.App.—Texarkana 1961, writ ref'd n.r.e.).

Saturn Energy Company, and Vale & Company (Apache) filed a motion for summary judgment, and the other defendants filed motions adopting and incorporating the evidence and argument in Apache's motion.

---

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

2. Apache Oil Corp., with APC Operating Partnership, L.P., Sonora Southwest Partnership f/k/a

■ The test for determining a well's profitability is 1) whether the production yields a profit after deducting operating and marketing costs and 2) whether a prudent operator would continue, for profit and not for speculation, to operate the well as it has been operated. *Pshigoda v. Texaco, Inc.,* 703 S.W.2d 416, 418 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.); *Ballanfonte v. Kimbell,* 373 S.W.2d 119, 120–21 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.); *see Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 691 (1959).

The first part of the test is set out in *Clifton* as,

> [T]he term "paying quantities," when used in the extension clause of an oil lease habendum clause, means production in quantities sufficient to yield a return in excess of operating costs, and marketing cost, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. The underlying reason for this definition appears to be that when a lessee is making a profit over the actual cash he must expend to produce the lease, he is entitled to continue operating in order to recover the expense of drilling and equipping, although he may never make a profit on the over-all operation.

*Clifton,* 325 S.W.2d at 692. Production in "paying quantities" means that the oil or gas produced from a lease must be sufficient to pay the lessee a profit, even small, over operating and marketing expenses, excluding the cost of drilling or re-working a well, but including all royalty payments. *Morgan v. Fox,* 536 S.W.2d 644, 650 (Tex. Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *see Pshigoda,* 703 S.W.2d at 418.

*Clifton,* 325 S.W.2d at 691, states what has become the second prong of the test:

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

"Whether there is a reasonable expectation of profitable returns from the well is the test." *Clifton,* 325 S.W.2d at 691.

■ To terminate a lease, the landowner must show both 1) and 2). If a well is profitable under part 1) of the test, part 2) is not applied. *See Skelly Oil v. Archer,* 356 S.W.2d 774, 783 (Tex.1962); *Bachler v. Rosenthal,* 798 S.W.2d 646, 648–49 (Tex. App.—Austin 1990, no writ); *Bell v. Mitchell Energy Corp.,* 553 S.W.2d 626, 630 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ).

■ Ordinarily, whether there has been "paying production" is a fact question. *Morgan v. Fox,* 536 S.W.2d 644, 650 (Tex. Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *Patton v. Rogers,* 417 S.W.2d 470, 476 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.); *Bain v. Strance,* 256 S.W.2d 208, 210 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.); *see Clark v. Holchak,* 152 Tex. 26, 254 S.W.2d 101, 102 (Tex.1953). The matter of allocation and calculation of expenses is generally a fact question. *Patton,* 417 S.W.2d at 476; *Sullivan and Garnett v. James,* 308 S.W.2d 891, 893 (Tex. Civ.App.—San Antonio 1957, writ ref'd n.r.e.). However, production in paying quantities may be established as a matter of law by showing a profit from the operation of the well. *Skelly Oil,* 356 S.W.2d at 783; *Morgan,* 536 S.W.2d at 650.

Appellees' summary judgment motion claims to demonstrate that appellants could not show that the well was unprofitable and could not show that a reasonably prudent operator would not have continued to operate the wells to make a profit but only for speculation. Appellees' proof includes the affidavit of George F. Sears, along with attached exhibits of production and expense data. The summary of appellees' evidence shows that the Thieme Well showed a net profit of revenues over expenses of $7,630.41 from January 1981 through April 1982, and of $5,254.37 from June 1983 through December 1984.

Appellants' response attacks the analysis, claiming that the calculation should have included higher royalties and depreciation of a compressor (and engine) unit used on the well. They rely on depositions of Tom Pelatari and others and affidavits of Robert M. Haley and R. Fred Hosey, with attachments.

Appellants argue that appellees should have qualified the well as a "stripper well," obtained higher gas prices under § 108 of the Natural Gas Policy Act, and paid them a higher royalty. They maintain that the well qualified for stripper status based on the production figures in the record, that it should have been qualified and received the higher § 108 price, and that this would have resulted in a higher royalty. While we recognize the duty to market the gas at the highest possible price, the fact remains that the § 108 royalty was not obtained during the periods in question. We do not deduce that the § 108 royalty must be subtracted in the paying quantities analysis.

Section 108 royalties are not relevant to the well's profitability in this case. Such royalties would be hypothetical, based on hindsight, speculative, not an actual expenditure, and never paid. Moreover, since the appellants claim only a ⅛ royalty interest, the other ⅞ of the increased royalty would be credited on the earnings side of the ledger, more than offsetting the ⅛ allegedly due appellants. Thus, appellants may not deduct a greater royalty in determining whether the well produced in paying quantities.

The other dispute concerns depreciation of the compressor. Appellants contend that Hosey's affidavit shows that a compressor system was needed to extract gas from the ground at the Thieme Well. They claim this compressor was salvable equipment, and that they have shown the appropriate depreciation. Appellants' proof includes the affidavit of Tom Pelatari, in which he depreciates the compressor based on an appraisal report by Harvey Davis of Hadco International, Inc. Appellants allocate the compressor's depreciation at $5,066.56 from January 1981 through April 1982, and at $5,099.98 from June 1983 through December 1984.

Appellees attack Davis' figures on compressor depreciation, contending that his appraisal is a reflection solely of the market for compressors generally and the resulting sales prices. They point out that his appraisal does not include the use or condition of the particular machine at the well, and characterize the valuation as a bookkeeping, rather than actual, depreciation. They also criticize the allocation of the loss of value based on "generally accepted accounting principles" rather than on the effects of the work on the life and utility of the machine.

The original costs of drilling, completing, and equipping a well are not deducted in a paying quantities analysis in Texas. *Garcia,* 164 S.W.2d at 511; *Clifton,* 325 S.W.2d at 692; *Skelly Oil,* 356 S.W.2d at 781. Periodic cash expenditures incurred in the daily operation of a well (sometimes called out-of-pocket lifting expenses) are to be classified as operating expenses, while one-time investment expenses, such as drilling and equipping costs, are to be treated as capital expenditures. *Pshigoda,* 703 S.W.2d at 418. Reworking expenses are part of the capital investment. *Pshigoda,* 703 S.W.2d at 419; *Morgan,* 536 S.W.2d at 650.

It is proper, in determining operating and marketing expenses, to "consider such expenses as taxes, overhead charges, labor, repairs, *depreciation on salvable equipment,* if any, and any other items of expense, if any." *Pshigoda,* 703 S.W.2d at 418 (emphasis added), citing *Skelly Oil,* 356 S.W.2d at 781. *See also Bales,* 362 S.W.2d at 388.

*Skelly Oil,* 356 S.W.2d at 781, mentions that salvable equipment should be depreciated "if the evidence shows it is subject to depreciation as a part of the expense in producing and marketing the gas." The opinion quotes favorably from an address,

All this points up the one inescapable conclusion that the bookkeeping entry of depreciation is in no sense an "out-of-pocket" lifting expense and it should *never* be included as an item to be de-

ducted from revenue to determine whether a lease is still producing in paying quantities. There is a possibility, however, that the lessor in a carefully prepared case could establish "actual depreciation" (as distinguished from the bookkeeping entry) as a legitimate charge to lifting expense. For example, in a pumping well the lessee may be using some equipment which has been "written off" completely and on which lessee is no longer taking any depreciation. Still that piece of equipment may have a current salvage value. To some extent continued operations are wearing out that equipment and reducing its salvage value. The proof may be difficult and the reduction in value may be slight, but the fact remains that there is "physical depreciation" which is properly chargeable to lifting expense.

In *Bales,* the landowners urged that a $365 depreciation charge on salvageable equipment should have been applied each month. Their C.P.A. testified that the useful life of the equipment on the well was fifteen years, with a salvage value of ten percent. He had never seen the equipment, admitted that his figures bore no relation to the actual or market value of the equipment, testifying that the figures came from his accounting experience with similar equipment. The appellate court rejected his "bookkeeping entry" as a proper deduction and distinguished it from "actual depreciation," which could be considered an expense. *Bales,* 362 S.W.2d at 390–92; *see Persky v. First State Bank,* 117 S.W.2d 861, 863 (Tex.Civ.App.—Amarillo 1938, no writ). Thus, to show the depreciation allowed in the paying quantities calculation, landowners must show the cost of the particular equipment and its rate of depreciation.

The record contains a receipt for the compressor, dated April 1964, showing its cost at $7,000. Appellants have not shown at what rate the compressor was subject to depreciation during the times in question. It was appellants' burden to present summary judgment evidence of the amount. This would be based on the cost of that compressor, not on its replacement cost or on its market value. Spreading the $7,000 cost of this compressor over its more than twenty-year service, the increment at which it depreciated during the periods in question clearly cannot be enough to negate the well's profit. We overrule appellants' point.

By cross-point, appellees challenge this Court's jurisdiction to hear the appeal, claiming that the clerk's certificate was not timely filed. In lieu of a cost bond, appellants deposited a $1000 check with the clerk. *See* Tex.R.App.P. 46(b). It was filed on December 18, 1990, the deadline for perfecting the appeal. The clerk did not sign or prepare the certificate of deposit until December 21, 1990. (Appellants requested permission to amend the record and documented the timely filing of the $1000.)

Appellants claim that the clerk's certification determines perfection of the appeal. However, under Tex.R.App.P. 40(a)(1), a civil appeal is perfected when the bond or cash deposit is "filed or made." Thus, the critical date is the date of deposit of the bond or its substitute. The deposit met the deadline. We overrule the cross-point.

We affirm the trial court's judgment.